**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Robert Raymond Navarro,
Petitioner
-vs-
Charles L. Ryan,
Respondent.

CV-12-1899-PHX-GMS (JFM)

**Report & Recommendation**
on
**Petition for Writ of Habeas Corpus**

## I. MATTERS UNDER CONSIDERATION

Petitioner, presently incarcerated in the custody of the Arizona Department of Corrections, filed through counsel an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 21, 2012 (Doc. 7).  Following a stay of some 3 months, on September 19, 2013 Respondent filed his second, amended Limited Answer (Doc. 29). Petitioner filed a Reply on November 3, 2013 (Doc. 35). Pursuant to the Court's Order (Doc. 38), Respondent filed an Amended Supplemental Answer on July 31, 2014 (Doc. 46), and Petitioner filed a Supplemental Reply on November 17, 2014 (Doc. 52).

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

**<u>The Record Provided by Respondents</u>** - A caution concerning the record referenced herein is necessary.

Exhibits to the original Amended Limited Answer (Doc. 12) (Exhibits A to M),

1

the amended Limited Answer (Doc. 29) (Exhibits N to RR), and the Amended Supplemental Answer (Doc. 46) (Exhibits QQ to GGGG), are generally labelled sequentially, and are referenced herein as "Exhibit ___." Respondent has referenced the exhibits in the original Amended Limited Answer (Doc. 12) in his second Limited Answer (Doc. 29 at 2, n.1), and not all of those exhibits are duplicated in later filings. Accordingly, the exhibits to all three filings are referenced herein.

Nonetheless, many of Respondent's exhibits to the three filings are duplicates, *i.e.*: Exhibits A & HHH; B& III; C & JJJ; D & NNN; E & OOO; F & PPP; G, Z & ZZ; H, AA, & QQQ; I, BB & RRR; J & CC; K & DD; L, EE, SSS & TTT (all contain the PCR Reply); L, FF & TTT (all contain the Motion to Amend); S & SS; T & TT; U & UU; V & VV; W & WW; X & XX; Y & YY; RR2 & AAA; PP & GGG; KK & VVV; LL & WWW; MM & XXX; NN & YYY; OO & ZZZ; QQ & AAAA; RR& BBBB . (However, Exhibit GGG (Opening Brief) to the Amended Supplemental Answer, Doc. 46, has been omitted from that label, but has been included as part of Exhibit FFF thereto.) For the sake of consistency, the undersigned will reference the first instance of an exhibit.

Exhibit labels QQ and RR are used twice. Accordingly, exhibits QQ and RR to the Amended Supplemental Answer (Doc. 46) may be referenced herein as Exhibits "QQ2" and "RR2."

Exhibit VV (R.T. 7/26/7) to the Amended Supplemental Answer, Doc. 46, has been omitted, but the referenced records have been included as Exhibit V (R.T. 7/26/7) to the second Limited Answer, Doc. 29.

Exhibit LLL (PCR Response 8/11/09) to the Amended Supplemental Answer, Doc. 46, has been omitted.

**The Record Provided by Petitioner** – The record provided by Petitioner is in significantly less disarray. Petitioner's original Petition (Doc. 1) came with Exhibits A through L attached. Petitioner's Amended Petition (Doc. 7) does not explicitly incorporate the exhibits from the original Petition but simply provides: "Additional

2

exhibits referenced by the amended portions are being filed contemporaneously with this Amended Petition."  Nonetheless, Petitioner continues to cite to exhibits provided only with the original Petition.

The Amended Petition has attached to it Exhibits E and M through VV.  The label "Exhibit E" is reused, and includes portions of the Record of Transcript for July 24, 2007, but provides only cover and index pages and one page of actual testimony, which is different from those provided in the original Exhibit E.

Petitioner has filed a Supplemental Exhibit WW (Doc. 23).

Petitioner's Reply (Doc. 35) comes with Exhibits XX through MMM.

Petitioner's Supplemental Reply (Doc. 52) to Respondent's Amended Supplemental Answer comes with Exhibits NNN through PPP.

Petitioner's Reply (Doc. 61) in support of his Motion for Evidentiary Hearing comes with Exhibits QQQ through RRR.

In sum, the exhibits to the original Petition (Doc. 1), Amended Petition (Doc. 7), Supplemental Exhibit (Doc. 23), Reply (Doc. 35), Supplemental Reply (Doc. 52), and Reply (Doc. 61) in support of Motion for Evidentiary hearing are referenced herein as "Pet. Exhibit ___."  Exhibit E to the Amended Petition may be referenced herein as "Pet. Exhibit E2."

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

In disposing of Petitioner's direct appeal, the Arizona Court of Appeals summarized the factual background as follows:

> On the evening of August 17, 2006, defendant and several of his friends entered the Wild Hare bar in Gilbert. Five to ten minutes after the men entered the bar, a fight commenced between the men and another patron. Eventually the bouncer became involved in the altercation, attempting to stop the fight. Defendant pulled out a knife and motioned it toward the bouncer's stomach, but the bouncer did not sustain any injury, A nearby patron who witnessed the incident pled for someone to call the police and defendant and his friends ran out of the bar.

3

Shortly after defendant and his friends fled in a white SUV, police officers pulled over their vehicle. The victim, two other bar employees, and a bar patron were driven by police to the traffic stop and they each identified defendant as the individual who threatened the victim with a knife.

After the witnesses identified defendant as the perpetrator, Gilbert Police Officer Chris R. informed defendant of his *Miranda* rights and placed him under arrest. The officer then questioned defendant about the events of the evening. Defendant repeatedly denied having been at the Wild Hare bar. Officer Chris R. then conducted a search of defendant's vehicle and found a small fixed-blade knife inside a leather sheath." When questioned, defendant admitted that he owned the knife.

While being transported to the Gilbert police station, defendant admitted that he and his "brothers" had been involved in a confrontation that evening. Defendant stated that his "only crime" was. "protecting [his] brothers."

(Exhibit A, Mem. Dec. at 2-3.)

## B. PROCEEDINGS AT TRIAL

On August 22, 2006, Petitioner was charged in a Direct Complaint (Exhibit QQ2) with a single count of aggravated assault, a class 3 dangerous felony. The State eventually filed Allegations of Serious Offense/Life Imprisonment (Exhibit RR2) pursuant to Arizona's three strikes law, Ariz. Rev. Stat. § 13-604(S) and (U) (June 13, 2007),[1] alleging that Petitioner had previously been convicted of two or more "serious offenses," including 1992 and 1994 convictions for armed robbery.

Petitioner proceeded to a jury trial, and was found guilty as charged. (Exhibit CCC, M.E. 7/27/07.) A hearing to the court was conducted on the priors, and the court found both of the alleged prior serious felony convictions. (Exhibit EEE, M.E. 8/27/07.)

On August 27, 2007, Petitioner was sentenced to life, with the possibility of parole after 25 years. (Exhibit DDD, Sentence.)

## C. PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a direct appeal, arguing that it was error to not instruct jurors on the lesser included offense of disorderly conduct. (Exhibit PP, Opening Brief.) The

---

[1] These provisions were subsequently repealed, and re-enacted as amended as part of Ariz. Rev. Stat. § 13-704. *See* 2008 Ariz. Legis. Serv. Ch. 301, eff. Jan. 1, 2009.

Arizona Court of Appeals rejected the argument, finding that against the advice of counsel and the court, Petitioner had requested that the disorderly conduct instruction be removed, and thus any error was invited.  (Exhibit A, Mem. Dec. 11/4/08 at 6.) Petitioner's conviction and sentence was affirmed.  (*Id.* at 7.)

Petitioner did not seek further direct review.  (Exhibit B, Order and Mandate.)

## D. PROCEEDINGS ON POST-CONVICTION RELIEF

**First PCR Proceeding** - On December 17, 2008, Petitioner instituted his first post-conviction relief (PCR) proceeding, by filing his Notice of Post-Conviction Relief (Exhibit C).  Petitioner eventually filed a PCR Petition (Exhibit KKK) arguing: (1) that the trial court erred by communicating with jurors during deliberations without defense counsel's presence about an exhibit consisting of a  witness statement, (2) that appellate counsel was ineffective for raising the claim, and (3) that trial counsel was ineffective for failing to move to suppress the knife found in Petitioner's vehicle.  In his Reply (Exhibit MMM), Petitioner additionally argued that similar *ex parte* communications had occurred with regard to the exhibit consisting of the knife.

The PCR court found the *ex parte* issues to be without merit, concluding that the only *ex parte* response by the court concerning the knife was to deliver the knife to the jury upon request, and that counsel was present during the response concerning the witness statement.   Consequently, the court concluded appellate counsel was not ineffective for raising the latter argument.  The court concluded that trial counsel was not ineffective because the search yielding the knife was not violative of the Fourth Amendment.  (Exhibit D, Order 10/16/09.)

Petitioner filed a petition for review with the Arizona Court of Appeals, which was summarily denied.  (Exhibit E, Order 4/26/11.)

Petitioner then filed a petition for review with the Arizona Supreme Court, which was summarily denied on September 27, 2011.  (Exhibit F, Order 9/27/11.)

**Second PCR Proceeding** – On September 10, 2012, shortly after filing his

original federal habeas petition (Doc. 1), Petitioner filed through counsel a second PCR petition (Exhibit G), arguing that Petitioner is innocent because what was perceived as the "knife" was nothing more than jewelry.  On January 14, 2013, Petitioner filed an amended PCR petition (Exhibit KK) continuing to assert the single claim of actual innocence, but with expanded factual allegations concerning misidentification of Petitioner, misidentification of Petitioner's jewelry for a knife, and potential impeachment based on the victim's criminal history.

On May 6, 2013, the PCR court dismissed the petition with prejudice.  (Exhibit OO, Order 5/6/13.)  The court rejected arguments asserted in the PCR Reply (Exhibit MM) and "in passing in the Petition" that Petitioner was misidentified.  That decision was in part on two bases: (1) the failure of Petitioner to present the claim in his petition; and (2) that it was not founded upon new evidence of actual innocence, let alone clear and convincing evidence. (Exhibit OO, Order 5/6/13 at 2-3.)

The PCR court rejected arguments about the knife because the proffered evidence showed nothing more than that Petitioner wore jewelry, and did not contradict testimony that he had a knife or shiny object in his hand. (*Id.* at 3-4.)

The PCR court rejected arguments about the victim's criminal history, finding: (1) that the victim was cross-examined at trial on the only criminal conviction which was admissible to impeach the victim's character; (2) that evidence of a history of violence was irrelevant given the absence of a claim of self-defense; and (3) that such history would not show Petitioner's innocence, but was merely impeachment.

Petitioner did not seek further review.  (Motion to Lift Stay, Doc. 22 at 2.)


## E.  PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing through counsel his original Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on September 7, 2012 (Doc. 1).  That original Petition asserted a single ground for relief, the ineffective assistance of counsel. The instances of defective performance alleged were:

(1) failure to present evidence of Petitioner's jewelry (Doc. 1 at 15);

(2) failure to pursue evidence of a misidentification (*id.* at 15-16); and

(3) failure to adequately pursue a jury instruction on the lesser included offense of

disorderly conduct, despite Petitioner's objection to the instruction (*id.* at 16-17).

An answer and service by certified mail was ordered on October 17, 2013 (Doc. 4). Service was completed on October 17, 2012 (Doc. 4).

On November 21, 2012, Petitioner filed the instant Amended Petition for Writ of Habeas Corpus (Doc. 7), adding another instance of deficient performance by trial counsel, namely the failure to adequately impeach the victim.   Magistrate Judge Anderson concluded that despite the requirement of a responsive pleading, leave to amend was required under Federal Rule of Civil Procedure 15(a) because more than 21 days had elapsed since service of the original petition.   Consequently, a deadline was set for Respondent to object or consent to the Court granting leave to amend *nunc pro tunc* to November 21, 2012.   (Order 12/3/12, Doc. 8.)

On December 4, 2012, Respondent consented (Doc. 10) to the filing of the petition *nunc pro tunc* as of November 21, 2012, but objected to any treatment of the amendment as being filed as of September 7, 2012, when the original Petition was filed.

On the same date, Respondent filed his original Limited Answer (Doc. 9), requesting a stay of proceedings until completion of Petitioner's then pending second PCR proceeding.

Consequently, on December 6, 2012, the Court granted leave to amend *nunc pro tunc* to November 21, 2012, construed the Limited Answer as a motion to stay and directed a response from Petitioner.   (Order 12/6/12, Doc. 11.)

A Response (Doc. 13) and Reply (Doc. 14) on the motion to stay were filed, and eventually the Court stayed consideration of the Petition until July 24, 2013 when the stay was lifted.   (Order 4/12/13, Doc. 19; Order 7/24/13, Doc. 25.)

Petitioner's Amended Petition again asserts a single ground for relief based upon the ineffective assistance of trial counsel.   The instances of defective performance

alleged are:

(1) failure to present evidence of Petitioner's jewelry (Doc. 7 at 15);

(2) failure to pursue evidence of a misidentification (*id.* at 15-16);

(3) failure to impeach the victim's credibility with his criminal history and the associated motive to fabricate his version of the facts and propensity to lie (*id.* at 16-25); and

(4) failure to adequately pursue a jury instruction on the lesser included offense of disorderly conduct, despite Petitioner's objection to the instruction (*id.* at 25-27).

Petitioner further argues that any failure to exhaust such claims should be excused for cause and prejudice founded upon the ineffective assistance of his PCR counsel. (*Id.* at 28-37.)

During the pendency of the stay, on June 11, 2013, Petitioner filed a supplemental Exhibit ("WW") to the Petition. (Doc. 23.)

**Response** – As noted above, Respondent had filed an original Limited Answer (Doc. 9) to the amended Petition (Doc. 7), and then an Amended Limited Answer (Doc. 12). Upon lifting the stay, the Court granted leave for an amended answer. (Order 7/24/13, Doc. 25.) Accordingly, on September 19, 2013, Respondent filed his second, amended Limited Answer (Doc. 29).[2]

Respondent argues that the original Petition (Doc. 1) was timely, but the Amended Petition (Doc. 7) was not, and that the new claim of ineffective assistance founded upon impeachment of the victim did not rise from a common core of operative facts with the claims in the original Petition, and thus did not relate back to the filing of the original Petition. Consequently, Respondent argues that portion of the Amended Petition should be dismissed as barred by the habeas statute of limitations. (Doc. 7 at -14-28.)

Respondent further argues that all of the claims of ineffective assistance are

---

[2] In an Order filed September 30, 2013 (Doc. 33), the Court ordered Exhibits N (Doc. 29-2) and Q (Doc. 29-4) to the amended Limited Answer be sealed on the basis that they contained medical records not relevant to the Petition.

procedurally defaulted (*id.* at 28-30), and that Petitioner has failed to establish cause to excuse his procedural default because the asserted claims of ineffective assistance are without merit (*id.* at 30-36) and he has not shown his actual innocence (*id.* at 37-38).

**Reply** - On November 3, 2013, Petitioner filed a Reply (Doc. 35) in support of his Amended Petition.  Petitioner argues his Amended Petition was timely (*id.* at 5-13), that his procedural default should be excused because his claims of ineffective assistance of trial counsel are "substantial" and thus PCR counsel was ineffective for failing to raise them (*id.* at 14-29); and that his claims of ineffective assistance of trial counsel are meritorious (*id.* at 29-70).

On January 13, 2014, Petitioner filed a Notice of Supplemental Authority (Doc. 36), referencing the then recent decision in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014), regarding the lack of a need to exhaust *Martinez* claims of ineffective assistance of PCR counsel as cause to excuse the failure to exhaust state remedies on claims of ineffective assistance of trial counsel.

**Supplemental Answer & Reply** – On May 1, 2014, Magistrate Judge Anderson directed Respondents to supplement their amended Limited Answer to address the merits of Petitioner's claims of ineffective assistance of trial counsel.  (Order 5/1/14, Doc. 38.)

Respondent complied, filing an original Supplemental Answer (Docs. 45) and then an Amended Supplemental Answer (Doc. 46) on July 31, 2014, addressing the merits of the ineffective assistance of trial counsel claims.

After obtaining a series of extensions, Petitioner filed his Supplemental Reply (Doc. 52) on November 7, 2014.

**Motion to Strike** – On November 28, 2014, Respondent filed a Motion to Strike (Doc. 53), arguing that Petitioner was attempting to insert new grounds for relief in his Supplemental Reply (Doc. 52).  In an Order filed April 7, 2015, the Court found that no new grounds for relief were asserted, and to the extent they were relevant to the existing

claims, the arguments could be considered. [3]   (Order 4/7/15, Doc. 69.)    No party has objected to that Order.

**Motion for Evidentiary Hearing** - On December 15, 2014, Petitioner filed a Motion for Evidentiary Hearing (Doc. 54), seeking an evidentiary hearing "to demonstrate that the procedural default of his underlying claims is excused." (Doc. 54 at 10.)  In the Order filed April 7, 2015 (Doc. 69), the Court concluded that in addressing Petitioner's assertions of ineffective assistance of trial counsel and/or PCR counsel, the Court need not apply the limitations of 28 U.S.C. § 2254(d) (*i.e.* contrary to or unreasonable application of federal law, or unreasonable determination of facts), because Petitioner's claims of ineffective assistance of trial and/or PCR counsel have never been "adjudicated on the merits in State court proceedings."    However, the Court also concluded that Petitioner remains subject to the limitations in 28 U.S.C. § 2254(e)(2), and because Petitioner failed to develop the factual basis of  his underlying claims of ineffective assistance of trial counsel, Petitioner is barred from obtaining an evidentiary hearing or otherwise expanding the record on the merits of those claims.

On the other hand, the Court also found that § 2254(e)(2) did not apply to this Court's determination of Petitioner's assertions of cause and prejudice under *Martinez v. Ryan,* 132 S.Ct. 1309 (2012),, and this Court is free to consider an expanded record, expand the record further, and/or conduct an evidentiary hearing to address Plaintiff's assertions under *Martinez*.

Thus, the Court concluded that § 2254(e)(2) continued to apply to the determinations of the ineffective assistance of counsel for purposes of granting relief.

---

[3] In his Supplemental Reply, Petitioner appears to argue that he is entitled to relief based on the ineffective assistance of PCR counsel, as well as the ineffective assistance of trial counsel.  (*See* Doc. 52 at 2.)  To the extent that this is not simply loose language, the undersigned finds no basis for relief on such a claim for two reasons: (1) it was raised for the first time as a ground for relief (as opposed to a basis to avoid procedural default) in a reply, *see Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir. 1994); and (2) there is no constitutional right to effective assistance of PCR counsel, *see Martinez v. Ryan,* 132 S.Ct. 1309, 1315 (2012).  He also argues that trial counsel failed to mount a defense (*See* Doc. 52 at 15, *et seq.*), a distinct claim that was not asserted in the Amended Petition.

The Court acknowledged the apparent incongruity of concluding that a habeas petitioner was given a right to pursue an assertion of cause and prejudice under *Martinez*, including supporting the argument through additions to the record, when he nonetheless might be stripped of the right to rely upon such additions once the cause and prejudice issues are resolved.

The Court also concluded that Petitioner could not proceed on an expanded record or with an evidentiary hearing under the exceptions in § 2254(e)(2), because Petitioner had not shown either that his claims arise form a new rule of constitutional law, or that the factual predicate for the claims could not have been previously discovered through the exercise of reasonable diligence.

Thus, under § 2254(e)(2), when considering the merits of Petitioner's claims the Court concluded that it is barred from holding an evidentiary hearing or considering a factual record beyond that before the state court, including any new evidence presented with Petitioner's briefs, or adduced in the course of resolving the procedural default issue.

Accordingly, the Motion for Evidentiary hearing was: (1) denied to the extent that it sought an evidentiary hearing or to otherwise expand the record to support Petitioner's claims for relief; and (2) conditionally granted to the extent that it sought an evidentiary hearing on Petitioner's assertions under *Martinez*, conditioned upon a determination that the claim may not be disposed of on the merits under 28 U.S.C. § 2254(b)(2), and a determination that expansion of the record by other means is not appropriate

No objection to that Order has been filed.

Accordingly, in addressing the Petition, the undersigned relies upon the ruling on the Motion for Evidentiary Hearing as the law of the case. *See* Fed. R. Civ. P. 72(a) ("party may not assign as error a defect in the order not timely objected to").

//

//

//

### III. APPLICATION OF LAW TO FACTS

**A.  TIMELINESS**

**1.   One Year Limitations Period**

Respondents assert that the claim added in Petitioner's Amended Petition is untimely.  As part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress provided a 1-year statute of limitations for all applications for writs of habeas corpus filed pursuant to 28 U.S.C. § 2254, challenging convictions and sentences rendered by state courts.  28 U.S.C. § 2244(d).  Petitions filed beyond the one year limitations period are barred and must be dismissed.  *Id.*

**2.  Commencement of Limitations Period**

**Conviction Final** - The one-year statute of limitations on habeas petitions generally begins to run on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[4]

Here, Petitioner's direct appeal remained pending through November 4, 2008, when the Arizona Court of Appeals denied his appeal.  (Exhibit A.)  Arizona's rules require that petitions for review to the Arizona Supreme Court be filed within "30 days after the filing of a decision."  Ariz.R.Crim.P. 31.19(a).    However, Arizona applies Arizona Rule of Criminal Procedure 1.3 to extend "the time to file an appeal by five days when the order appealed from has been mailed to the interested party and commences to run on the date the clerk mails the order."  *State v. Zuniga*, 163 Ariz. 105, 106, 786 P.2d 956, 957 (1990).  This rule has been extended to post-conviction relief proceedings.  *See State v. Goracke*, 210 Ariz. 20, 21 n.1, 106 P.3d 1035, 1036 n.1 (Ct. App. Div. 12005).  *See also State v. Brock,* 163 Ariz. 523, 526, 789 P.2d 390, 393 (Ct. App. Div. 1 1989) (supplemental opinion), *aff'd*, 165 Ariz. 296, 798 P.2d 1305 (1990) (applying to PCR

---

[4]  Later commencement times can result from a state created impediment, newly recognized constitutional rights, and newly discovered factual predicates for claims.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).  Petitioner proffers no argument that any of these apply.

motion for reconsideration of appellate court ruling).

Here, the record does not reflect when the clerk mailed the Memorandum Decision of the Arizona Court of Appeals (Exhibit A). The only record to reflect the mailing of anything by the Arizona Court of Appeals was that in the Order and Mandate filed December 24, 2008 (Exhibit B). That record explicitly reflects only that "a copy of the ORDER and MANDATE" were mailed to the parties on December 22, 2008. (*Id.* at 1.) At best, there is an implicit finding of such mailing in the determination in the Order and Mandate that the times for filing motions of reconsideration and a petition for review had expired. This would suggest that the Memorandum Decision had been mailed at least 35 days previously, *i.e.* no later than November 17, 2008. Neither Petitioner nor Respondent address this issue.

Because it does not affect the outcome, the undersigned presumes (in Respondent's favor) that the Memorandum Decision was mailed on the date issued, November 4, 2008. Consequently, Petitioner had 35 days, or through December 9, 2008, to seek review by the Arizona Supreme Court.

Petitioner did not seek such review, and therefore, Petitioner's one year began running on December 10, 2008, and without any tolling expired on December 9, 2009, making even his original Petition (filed September 7, 2012) almost three years delinquent.

**3. Statutory Tolling**

The AEDPA provides for tolling of the limitations period when a "properly filed application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). This provision only applies to state proceedings, not to federal proceedings. *Duncan v. Walker*, 533 U.S. 167 (2001).

**Tolling for First PCR Proceeding** - Petitioner's limitations period commenced running on December 10, 2008. Petitioner's first PCR proceeding was commenced on December 17, 2008, just seven days after his limitations period began running, when he

filed his first PCR Notice (Exhibit C).  *See Isley v. Arizona Department of Corrections*, 383 F.3d 1054, 1055-56 (9th Cir. 9/13/04) ("The language and structure of the Arizona postconviction rules demonstrate that the proceedings begin with the filing of the Notice.")

For purposes of calculating tolling under § 2244(d), the federal prisoner "mailbox rule" applies.  Under this rule, a *pro se* prisoner's state and federal filings are deemed "filed" when they are delivered to prison officials for mailing.[5]  In *Anthony v. Cambra*, 236 F.3d 568 (9th Cir. 2000), the Ninth Circuit noted:

> [I]n *Saffold v. Newland*, 224 F.3d 1087 (9th Cir.2000), we squarely held that the mailbox rule applies with equal force to the filing of state as well as federal petitions, because "[a]t both times, the conditions that led to the adoption of the mailbox rule are present; the prisoner is powerless and unable to control the time of delivery of documents to the court." Id. at 1091.

*Anthony*, 236 F.3d at 575.

However, Petitioner does not assert that his first PCR notice was delivered to prison officials for mailing, or that such delivery occurred prior to its filing date on December 17, 2008.  Because it does not affect the outcome, the undersigned presumes (in Respondent's favor) that the prison mailbox rule does not apply, and that the PCR petition was not filed until December 17, 2008.[6]  With the seven days elapsed between December 10, 2008 when Petitioner's conviction became final, and December 17, 2008 when his PCR notice was filed, Petitioner had 358 days of his one year limitations period remaining.

That proceeding remained pending until September 27, 2011, when the Arizona Supreme Court denied Petitioner's Petition for Review.  (Exhibit F, Order 9/27/11.)

---

[5] In *Orpiada v. McDaniel*, 750 F.3d 1086 (9th Cir. 2014), the Ninth Circuit clarified that this principle does not extend to rendering a state filing "timely" and thus properly filed, unless the state itself would apply a prison mailbox rule.  Here, however, there is no suggestion that Petitioner's PCR notice was untimely.  Moreover, Arizona routinely applies the prison mailbox rule.  *See e.g. Mayer v. State,* 184 Ariz. 242, 245, 908 P.2d 56, 59 (App.1995) (notice of direct appeal); *State v. Rosario*, 195 Ariz. 264, 266, 987 P.2d 226, 228 (App.1999) (PCR notice); *State v. Goracke*, 210 Ariz. 20, 23, 106 P.3d 1035, 1038 (App. 2005) (petition for review to Arizona Supreme Court).

[6] At best, Petitioner's first PCR notice (Exhibit C) could have been delivered for mailing on December 9, 2008, the date it was signed by Petitioner.  (*Id.* at 4.)

14

Thus, Petitioner's habeas limitations period was tolled from December 17, 2008 through September 27, 2011. It commenced running again on September 28, 2011, and without further tolling expired 358 days later on September 20, 2012.

**Tolling for Second PCR Proceeding** - Petitioner's second PCR proceeding was commenced on September 10, 2012,[7] ten days before his limitations period expired, when he filed his second PCR petition (Exhibit G).[8]

Respondent argues that no tolling was permissible for this proceeding because it was deemed not timely filed. (2nd Limited Answer, Doc. 39 at 16, n. 4.) Indeed, statutory tolling of the habeas limitations period only results from state applications that are "properly filed," and an untimely application is never "properly filed" within the meaning of § 2244(d)(2). *Pace v. DiGuglielmo*, 544 U.S. 408 (2005).

However, Petitioner's second PCR proceeding as not rejected as untimely. To the contrary, the PCR court observed:

> Defendant has filed a second petition under Rule 32.1 (h). A petition filed under Rule 32.1(h) need not be timely filed. See Rule 32.4(a).

(Exhibit OO, Order 5/6/13 at 2.) It is true that the PCR court observed in a footnote: "lIt appears to the Court that the issues raised by defendant in this petition are primarily ineffective assistance of counsel issues disguised in a Rule 32.1 (h) claim." (*Id.* at n.1.) However, the PCR court plainly rejected such a construction of the petition:

> Before addressing the issues in this Petition for Post-Conviction Relief, the Court will address what this petition is not about. This is not a claim for ineffective assistance of counsel. Defendant readily concedes that ineffective assistance of counsel issues are precluded and are currently pending in the federal habeas corpus claim. Thus, defendant's complaints that counsel failed to investigate the issue of mistaking the knife for jewelry, failed to request a lesser-included offense and failed to provide effective assistance during the prior PCR will not be addressed.

(*Id.* at 2.)

Rather, Petitioner's 2nd PCR petition was rejected on the merits, with the PCR

---

[7] That petition was filed by counsel, and consequently the prison mailbox rule would not apply. *See Stillman v. LaMarque,* 319 F.3d 1199 (9th Cir. 2003).
[8] The trial court docket reflects that no notice of post-conviction relief was filed prior to the filing of the PCR petition. (Exhibit QQ at 1.)

1    court concluding that "the Court finds no colorable claim under Rule 32.1(h) that would

2    entitle defendant to an evidentiary hearing."  (*Id.* at 5.)

3          Accordingly, Petitioner is entitled to statutory tolling for his 2nd PCR proceeding.

4          That proceeding remained pending at least through May 6, 2013, when the PCR

5    court dismissed the petition.[9]  (Exhibit OO, Order 5/6/13.)

6          Petitioner contends that he is entitled to tolling for the time thereafter in which he

7    had to seek further review, citing 28 U.S.C. § 2244(d)(2).  (Reply, Doc. 35 at 7, n. 4.)

8          In the seven circuits known to have addressed the matter, Petitioner's PCR

9    proceeding would be deemed pending until his time to file for review expired, regardless

10   of the fact that he did not again seek review. *See Bennett v. Artuz*, 199 F.3d 116 (**2nd**

11   **Cir.**1999) ("a state-court petition is 'pending' from the time it is first filed until finally

12   disposed of and further appellate review is unavailable under the particular state's

13   procedures"), but see *Saunders v. Senkowski*¸ 587 F.3d 543, 549 (2nd Cir. 2009) (tolling

14   doesn't include time for unpursued motion for reconsideration); *Swartz v. Meyers*, 204

15   F.3d 417, 420–24 (**3rd Cir.**2000) ("the period of limitation tolls during the time a

16   prisoner has to seek review of the Pennsylvania Superior Court's decision whether or not

17   review is actually sought"); *Taylor v. Lee*, 186 F.3d 557, 561 (**4th Cir.**1999) ("the entire

18   period of state post-conviction proceedings, from initial filing to final disposition by the

19   highest state court (whether decision on the merits, denial of certiorari, or expiration of

20   the period of time to seek further appellate review), is tolled"); "); *Williams v. Cain*, 217

21   F.3d 303, 309–10 (**5th Cir.**2000); *Williams v. Bruton*, 299 F.3d 981, 983 (**8th Cir.**2002)

22   ("the application is 'pending' (and thus the limitations period is tolled) during the appeal

23   period, even if the petitioner does not appeal"); *Gibson v. Klinger*, 232 F.3d 799, 804

24   (**10th Cir.**2000) ("regardless of whether a petitioner actually appeals a denial of a post-

25   conviction application, the limitations period is tolled during the period in which the

26   petitioner could have sought an appeal under state law"); *Cramer v. Secretary, Dept. of*

27

28   _____

[9] This Order (Exhibit OO) was not filed until the following day, May 7, 2013.  The Court presumes (in Respondent's favor) that it was nonetheless effective as of May 7, 2013.

*Corrections*, 461 F.3d 1380, 1383 (**11th Cir.** 2006) (*per curiam*) ("the claim is pending regardless of whether the inmate actually files the notice of appeal  *See also Johnson v. McCaughtry*, 265 F.3d 559, 563 n. 3 (**7th** Cir. 2001) (declining to decide the issue); and *Yassan v. J.P. Morgan Chase and Co.*, 708 F.3d 963, 969 (7th Cir. 2013) (quoting *Cramer* approvingly in the context of a civil action).  *See Federal Habeas Manual §  9A:70;*

The Ninth Circuit has not directly addressed this matter.  District courts in this circuit have concluded that there is no tolling for the time for unsought review.  *See Hines v. Bartos*, CV 06-697-PHX-JAT(LOA), 2007 WL 1381655 (D.Ariz. 2007) (concluding that "an appeal that is never filed cannot be considered timely and Petitioner cannot reap the benefit of statutory tolling without actually filing a petition for review of the post-conviction relief denial"); *Lopez v. Arizona*, 2011 WL 3471084, 6 (D.Ariz. 2011) (CV-10-2159-PHX-JAT(JRI)) (finding no equitable tolling after PCR court's decision, where petition for review was untimely, including for time review could have been sought); *Canez v. Ryan*, No. 12-CV-2232-PHX-PGR(LOA), 2014 WL 2708363 (D. Ariz. 2014) (gap between review tolled only if subsequent review timely sought, and unsought review not timely sought); and *Holemen v. Ryan*, No. CV12-02350-PHX-SRB(JFM), 2013 WL 3716603 (D. Ariz. 2013) (same).

Because it does not affect the outcome, the undersigned presumes (in Respondent's favor) that the Ninth Circuit would buck the trend, and decide that Petitioner would not be entitled to tolling for the time for further review, for the reasons discussed in *Holeman*, 2013 WL 3716603.

Accordingly, Petitioner's second PCR proceeding was no longer pending after May 6, 2013, and his limitations period began running again on May 7, 2013 and expired ten days later on May 16, 2013.

Thus, even under presumptions favorable to Respondent, Petitioner's original Petition (Doc. 1), filed September 7, 2012, and his Amended Petition (Doc. 7), filed November 21, 2012, were both timely.

**4.  Timeliness of Subsequently Raised Claims – Motion to Strike**

In his Motion to Strike (Doc. 53), Respondent contended that Petitioner's Supplemental Reply (Doc. 52), filed November 7, 2014, asserted new claims and that those new claims are untimely.  Indeed, if Petitioner's limitations period expired May 16, 2013, any claims raised thereafter (including any effectively raised in a Supplemental Reply filed some 18 months later) would be untimely, unless entitled to be related back to an early filing.

In response, Petitioner argued that it was not his intent to assert new claims in his Supplemental Reply.  (Response to Motion to Strike, Doc. 54 at 1, 7.)  Indeed, Petitioner again enumerates his specific claims in substantial conformance with the enumeration adopted by the Court hereinabove in Section II(E).  (Response to Motion to Strike, Doc. 54 at 6.)  He describes any additions as simply new "arguments."

Consequently, in the Order filed April 7, 2015 (Doc. 69), the Court denied the Motion to Strike, and observed that, to the extent that Petitioner's *new arguments* in his Supplemental Reply extend beyond the scope of his *existing claims*, those arguments may be irrelevant..

**5.  Summary re Statute of Limitations**

Applying all available presumptions in Respondent's favor, Petitioner's one year habeas limitations period commenced running no sooner than December 10, 2008, ran for seven days, was tolled for at least the period from December 17, 2008 through September 27, 2011 (for his first PCR proceeding), ran for 349 days (a total of 356 days, leaving him 9 days), was tolled for the period September 10, 2012 through at least May 6, 2013 (for his second PCR proceeding) and expired no sooner than May 15, 2013.  As a result both his original Petition (Doc. 1, filed September 7, 2012) and his Amended Petition (Doc. 7, filed November 21, 2012) were timely.

/ /

/ /

**B. AUTHORITY TO ADDRESS MERITS DESPITE PROCEDURAL DEFAULT**

**Claims Procedurally Defaulted**- Respondents argue that Petitioner's claims were never fairly presented to the state courts, and that Petitioner may no longer present his unexhausted claims to the state courts.  Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. Proc. 32.2(a) and time limit bar, set out in Ariz. R. Crim. P. 32.4. (Second Amended Limited Answer, Doc. 29 at 27.)  Thus, Respondents argue, Petitioner's state remedies are procedurally defaulted, and his claims are barred from federal habeas review.

Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted.  *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on the petitioner to show that he has properly exhausted each claim.  *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied*, 455 U.S. 1023 (1982).

Ordinarily, "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32."  *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994).   Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court.  This is true even where alternative avenues of reviewing constitutional issues are still available in state court.  *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989).  "In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'"  *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).[10]

Ordinarily, unexhausted claims are dismissed without prejudice.  *Johnson v.*

---

[10]  Although Petitioner received a life sentence, Respondents concede that *Swoopes* applies to "non-capital prisoners."  (second amended Limited Answer, Doc. 29 at 26.)

*Lewis*, 929 F.2d 460, 463 (9th Cir. 1991).  However, where a petitioner has failed to properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief.  Dismissal with prejudice of a procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Petitioner concedes that his claims were never fairly presented and are now procedurally defaulted.  (Amended Petition, Doc. 7 at 29; Reply, Doc. 35 at 14.)

**Cause and Prejudice** - If the habeas petitioner has procedurally defaulted on a claim, or it has been barred on independent and adequate state grounds, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).[11]

The only basis for "cause" asserted by Petitioner is the ineffective assistance of his PCR counsel in failing to raise the claims of ineffective assistance of trial counsel asserted in this Petition.

In *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), the Court recognized that because courts increasingly reserve review of claims of ineffective assistance of trial counsel to post-conviction relief proceedings, the ineffectiveness of counsel in such PCR proceedings could effectively defeat any review of trial counsel's ineffectiveness.[12] Accordingly, the Court recognized a narrow exception to the Court's ruling in *Coleman, supra,* that the ineffectiveness of PCR counsel cannot provide cause.  Arizona, the state at issue in *Martinez*, is just such a state, and accordingly ineffective assistance of PCR counsel can establish cause to excuse a procedural default of a claim of ineffective assistance of trial counsel.

---

[11]  Actual innocence also provides a basis to avoid a procedural default.  However, assertions of actual innocence should ordinarily be addressed only as a last resort.  *See Dretke v. Haley*, 541 U.S. 386, 393-394 (2004).

[12]  In *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), the Court extended *Martinez* to cases where state law did not mandate that claims of ineffectiveness be brought in PCR proceedings, but provided no other meaningful avenue for review.

For Petitioner to rely upon *Martinez*, Petitioner must "demonstrate[e] two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'"  *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S.Ct. at 1318).

Thus, to determine the existence of cause and prejudice, this Court must resolve whether, under *Martinez*, Petitioner's PCR counsel was ineffective so as to provide cause for Petitioner's failure to properly exhaust his claims concerning the ineffectiveness of trial counsel.  In evaluating the ineffectiveness of PCR counsel (and as part thereof, the ineffectiveness of trial counsel), this habeas Court is not constrained by the limits on grants of habeas relief in 28 U.S.C. § 2254, *i.e.* state court decisions contrary to or unreasonable application of Supreme Court law, etc..  *Cf. Martinez*, 132 S.Ct. at 1320 (finding limits on habeas relief for ineffectiveness of PCR counsel not applicable to cause and prejudice determination).  Nor in making such determinations is this habeas Court limited to the record developed in the state courts.  (*See* Order 4/7/15, Doc. 69.)

In contrast, when addressing the merits of Petitioner's claims (assuming Petitioner could show cause and prejudice), this Court has concluded that Petitioner remains subject to the limitations in 28 U.S.C. § 2254(e)(2), and because Petitioner failed to develop the factual basis of  his underlying claims of ineffective assistance of trial counsel, Petitioner is barred from obtaining an evidentiary hearing or otherwise expanding the record on those claims.  (*See* Order 4/7/15, Doc. 69.)

**Proceeding to Merits** - Because the record developed in the state court on Petitioner's claims is fairly limited, and the proffered evidence (either already submitted herein by affidavit, etc., or proffered in Petitioner's requests for an evidentiary hearing) is expansive, resolution of the cause and prejudice issue is a markedly more arduous task than proceeding to the merits of Petitioner's claims.  "Procedural bar issues are not

infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (discussing avoiding procedural default on appeal).

As noted in the Court's April 7, 2015 Order (Doc. 69), where the habeas court is faced with an exhaustion or procedural default issue on a claim which is without merit, the court is free to dispose of the claim on the merits. 28 U.S.C. § 2254(b)(2). *See Gallegos v. Schriro*, 583 F. Supp. 2d 1041, 1058 (D. Ariz. 2008) (applying § 2254(b)(2) to procedurally defaulted claims); *Henry v. Ryan*, 720 F.3d 1073, 1079-80 (9th Cir. 2013), *reh'g denied* (Dec. 30, 2014), *cert. denied*, 134 S. Ct. 2729 (2014) (despite assertion of procedural default, "[w]e therefore exercise our discretion to deny the claim on the merits as permitted by 28 U.S.C. § 2254(b)(2)"); *Runningeagle v. Ryan*, 686 F.3d 758, 769 n. 3 (9th Cir. 2012) (discussing authority to proceed under § 2254(b)(2) despite potential procedural default); *Hameen v. State of Delaware*, 212 F.3d 226, 251-52 (3d Cir. 2000) ("Thus, although 28 U.S.C. § 2254(b)(2), which provides that '[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State,' is not in terms applicable to procedural defaults we see no reason why we should not act consistently with that section when there is a possible procedural default."); *Thompson v. Sec'y for Dept. of Corr.*, 517 F.3d 1279, 1283 n.8 (11th Cir. 2008) (applying § 2254(b)(2) in face of assertion of procedural default); *Medlock v. Ward*, 200 F.3d 1314, 1322 (10th Cir. 2000) (approving of district court's proceeding to merits under § 2254(b)(2) in face of procedural default);

That alternative is available, however, "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005). Thus, this Court can only "deny relief on the merits of an unexhausted claim…when it is perfectly clear that the petitioner has no chance of obtaining relief." *Id.*

### C.  MERITS OF CLAIMS

### 1.  Standards Applicable on Habeas Review

While the purpose of a federal habeas proceeding is to search for violations of federal law, in the context of a prisoner "in custody pursuant to the judgment a State court," 28 U.S.C. § 2254(d) and (e), not every error justifies relief.  There are substantial limits on the authority of habeas courts to grant relief to state habeas petitioners when the state courts have rejected a claim on its merits.  *See* 28 U.S.C. § 2254(d).  Here, although Petitioner argued to the trial court much of the underlying disputes as a basis for a finding of actual innocence based on new evidence, he did not present the instant claims of ineffective assistance.  Where the claim was never addressed on the merits by the state courts, the federal habeas court must address the claim *de novo*, and the restrictive standards of review in § 2254(d) do not apply.  *Johnson v. Williams*, 133 S.Ct. 1088, 1091-92 (2013).

On the other hand, even where there is a lack of a merits determination by the state courts, because of Petitioner's failure to develop the record on his claims, this Court is limited by § 2254(e)(2) to the record developed in the state courts in determining the merits of Petitioner's claims.  (*See* Order 4/7/15, Doc. 69.)

Finally, it is important to note that because the undersigned has proceeded to the actual merits (for purposes of granting habeas relief) of Petitioner's claims, the undersigned does not apply the lower "some merit" standard applicable under *Martinez* for assessing trial counsel's ineffectiveness to establish PCR counsel's ineffectiveness as cause to excuse a procedural default.  Instead, Petitioner must meet his burdens of proof of establishing his claims.


### 2.  Standard for Ineffective Assistance Claims

Generally, claims of ineffective assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on such a claim, Petitioner must show:  (1) deficient performance - counsel's representation fell below the

23

objective standard for reasonableness; and (2) prejudice - there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88.  Although the petitioner must prove both elements, a court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. *Id.* at 697.

**Deficient Performance** - An objective standard applies to proving deficient performance, and requires a petitioner to demonstrate that counsel's actions were "outside the wide range of professionally competent assistance, and that the deficient performance prejudiced the defense." *United States v. Houtcens*, 926 F.2d 824, 828 (9th Cir. 1991) (quoting *Strickland*, 466 U.S. at 687-90).    The reasonableness of counsel's actions is judged from counsel's perspective at the time of the alleged error in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689.  There is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy.   *U.S. v. Quinterro-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995), *cert. denied*, 519 U.S. 848 (1996); *U.S. v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991).    The court should "presume that the attorneys made reasonable judgments and decline to second guess strategic choices." *U.S. v. Pregler*, 233 F.3d 1005, 1009 (7th Cir. 2000).

Further, the court need not determine the actual reason for an attorney's actions, as long as the act falls within the range of reasonable representation.   *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96 (1992).   On the other hand, while they need not discern the actual reason for counsel's conduct to deem it reasonable, "courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–527 (2003)).

"The law does not require counsel to raise every available nonfrivolous defense.

Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (citations omitted). Moreover, it is clear that the failure to take futile action can never be deficient performance. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996); *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012). "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel." *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982).

Petitioner asserts four instances of ineffective assistance of trial counsel. (1) failure to pursue jewelry evidence; (2) failure to pursue a possible misidentification; (3) failure to impeach the victim with his criminal history; and (4) failure to insist on a lesser-included-offense instruction. Each will be addressed in turn.

### 3. Merits of Claim of Ineffectiveness re Jewelry

Petitioner complains that trial counsel failed to investigate and present evidence that Petitioner wore jewelry. Petitioner argues:

> Trial counsel's failure to present evidence of Mr. Navarro's jewelry was less than minimally competent. The sole issue at trial was whether or not Mr. Navarro had threatened Mr. Olivera with a knife. Evidence of Mr. Navarro's jewelry would have provided an alternative explanation to the State's theory of the case: that Mr. Olivera and the other witnesses had simply mistaken Mr. Navarro's jewelry for a "knife" in the heat of a bar fight. There is no reasonable basis for failing to present this evidence, and trial counsel has offered none, stating only "I can't imagine I could miss something like that."

(Amended Petition, Doc. 1 at 15.) In support of this argument, Petitioner points to 2012 affidavits, submitted with his Amended Second PCR Petition (Exhibit KK), from Petitioner's brother-in-law, C.M., his step-brother, D.H., and his wife, D.A-N.. (Orig. Pet., Doc. 1 at Exhibits B, C, and D.)

Petitioner's brother-in-law avows:

> That night, Robert was wearing several pieces of jewelry. Specifically, he had on a big silver ring with a diamond, a silver

bracelet, a silver watch, and a silver chain-like necklace with a medallion. Robert always wore this jewelry when he went out.

(*Id.* at Exhbiit B at ¶ 2.)

Petitioner's step-brother avows:

That night, Robert…was also wearing a silver watch, a silver ring, a silver chain bracelet, and a matching necklace. The necklace hung down to the middle of Robert's chest.

(*Id.* at Exhibit C at ¶ 4.)

Petitioner's wife avows:

Robert always wore several items of jewelry when he went out. Specifically, he wore a silver bracelet, a silver watch with silver chain, a silver ring with a diamond, and a silver chain necklace with a large silver medallion. The ring was a promise ring that I had given him. Though I do not have a specific memory of what Robert was wearing that night, I cannot remember a single instance when Robert did not have this jewelry on. I would have noticed and remembered if he did not have his jewelry on.

(*Id.* at Exhibit D at ¶ 4.)

Petitioner also presents an interview of trial counsel with the following exchange:

**Andrew**: One other thing in the record, or in the trial transcript, uh, B.O., the victim, mentioned during his testimony, if I can find it here real quick … uh, that Robert, or in this case "the gentlemen who was threatening me, had a chain on his neck." And then, uh, C.M. … mentioned that Robert wore a shiny ring, on his right hand. Uh, do you know if there was ever any discussion about whether or not the knife or whatever the victim supposedly had seen might have been jewelry that he had mistaken?

**Ed**: [Trial counsel] Uh, I don't recall that. It's possible, I mean it sounds like something that I would have argued but, uh, I don't recall.

**Andrew**: Okay.

**Ed**: And if you read my closing argument, uh, I tend to give whether long closing arguments, uh, just trying to list as many, uh, reasonable doubts.

**Andrew**: Okay,

**Ed**: Things that are possible.

**Andrew**: Yeah. I didn't see anything in the closing argument, but I also didn't see anything in either the prosecutor's opening or rebuttal saying "no this isn't a case of mistaken identity." Uh, do you remember Robert mentioning anything about jewelry, like, pretrial or anything like that?

**Ed**: Yeah, I'll have to look in my notes. I usually keep most of what I do for a trial like that. In fact, I probably have on my computer the closing argument. .. uh, I usually do go through every one of the witness uh, when I do a closing. I can't image I would have missed something like that…

(Pet. Exhibit CCCC, Sussee Interview at 16.)

In contrast, Respondent argues that the jewelry theory was presented to the jury in evidence and in the closing arguments, the other testimony was inconsistent with a flash of jewelry, and counsel had a reasonable trial strategy of limiting his argument to the ring, rather than pursuing a laundry list of jewelry. (Amend. Supp. Ans., Doc. 46 at 22.) Respondent further argues that Petitioner fails to show prejudice given the other evidence supporting a finding that Petitioner threatened the victim with a knife. (*Id.* at 22-23.)

In his original Reply, Petitioner argues that counsel failed to adequately investigate (either personally or through his investigator) (Reply, Doc. 35 at 31-34), presented only a single question regarding the jewelry and barely addressed it in closing (*id.* at 34-36), and given the limited evidence to support a finding of a knife and the jury's focus on the knife there is a reasonable possibility that a different outcome might have occurred from additional evidence on this point (*id.* at 36-42).

In his Supplemental Reply, Petitioner argues that prejudice is shown because the existence of the knife was critical to the case and foremost in the mind of the jury, and that trial counsel's admitted shotgun approach is an admission of deficient performance. (Supp. Reply, Doc. 52 at 18-19.)

**Failure to Present Evidence** – Petitioner argues that trial counsel failed to present testimony from his relatives regarding the jewelry.

As noted by Respondents, trial counsel did elicit some testimony about Petitioner's jewelry. During trial counsel's redirect examination of Petitioner's brother-in-law, C.M., the following exchange took place:

> Q: You were asked if you saw if [Petitioner] had any kind of a weapon with him?
> A: Yes.
> Q: Do you know if he had anything shiny in his hands of any sort that might have been mistaken for metal or a weapon?
> A: Yes.
> Q: What was that?
> A: He always wears a shiny ring on his right hand.

(Exhibit V, R.T. 7/26/7 at 17.)

Petitioner fails to show that counsel had the additional evidence available to him at trial. Petitioner has provided no evidence that any of these witnesses told counsel prior to trial of Petitioner's jewelry. This Court is required "to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. If counsel was unaware that such testimony was available, he cannot be faulted for failing to present it.

On the other hand, that does not resolve whether counsel performed reasonably in seeking out such information.

**Failure to Investigate** - Doubtless, a failure to investigate a meritorious defense may constitute ineffective assistance of counsel. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Morris v. California*, 966 F.2d 448 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96 (1992). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

But here, Petitioner proffers nothing to show that counsel did not reasonably investigate. Ordinarily, this would require showing that counsel either did not interview the witnesses, or failed to do so adequately to discover the omitted testimony. Petitioner does neither.

Trial counsel reported in his interview that although he didn't specifically recall interviewing particular witnesses, it was his habit to personally interview witnesses.

> **Ed**: … And uh, in a case like this where everything just hinged on what the, uh, witnesses were going to say -- I always interview the witnesses. Any state witnesses I will interview uh, occasionally there's a minor change of custody witness or someone like that you don't end up talking to, but I don't think I've ever gone to trial on a case where I didn't interview all the key witnesses of the state that we're allowed to. I mean we can't interview the victims anymore.
>
>      * * *
>
> **Andrew**: Right. Uh, do you remember which witnesses you talked to?
>
> **Ed**: Uh, I would have had –

**Andrew**: Actually let me back up a second. Do you interview them or do you have [the investigator] Art interview them first, and then you interview them afterwards? Or ...

**Ed**: The only time I have Art interview them is when, urn, they're are like co-defendants or somebody that's apt to -- the kind of people I have my investigator, or the kind of witnesses I have my investigator interview, are the ones where we don't want to make a written record or a recorded, recording of it until we find out exactly what they are going to say. Because usually your clients says "oh, go talk to so and so, go talk to my codefendants" And you go talk to them and they just say "uh, yea what it says in the police report, that's what."

**Andrew**: Right.

**Ed**: And you don't want to record something like that, 'cause that is not going to help you in trial. Uh, so that's the only kind of witnesses I have him do. Uh, or if he's having to hunt somebody down when he finds them, you know, interview them, get whatever they have to say. But if it's a regular witness that the state has listed and intends to call, uh, OPDS grounds let our investigators do those. Particularly the police officers, they don't want us to spend money on an investigator, and I've pretty religiously done those myself. In fact, one of the directors of the OPDS, he was using me as an example of what we're, what a contractor attorney is supposed to do –

**Andrew**: Okay

          * * *

**Andrew**: Well, let me ask you about a couple of the witnesses. So the group that was with Robert in the car are, were, [D.H.], [A.G.] and [E.G.], [P.H.], and [C.M.]. Dh, do you remember talking to them?

**Ed**: I don't, I don't have memory -- I mean, I don't have, I don't recall. I'm sure I did because uh, anybody that was with him that was a witness ...

**Andrew**: Okay.

(Orig. Pet., Doc. 1, Exhibit G, Sussee Interv. at 7-9.)

       In their affidavits, the witnesses D.H. and C.M. report only that they had not been contacted by counsel since the trial.  They make no assertions about contacts from trial counsel. D.A-N. made no reference to discussions with counsel. (*Id.* at Exhibits B, C, D.) Thus, nothing in the record shows that trial counsel did not interview the witnesses. Similarly, the witnesses make no representations that trial counsel did not inquire about Petitioner's jewelry.  Nor do they represent that they told trial counsel about the jewelry.

       Petitioner argues that as of the May 8, 2007 Pre-Trial Settlement Conference (some 76 days prior to trial), counsel had not interviewed the witnesses. (Reply, Doc. 35 at 32.)  But counsel indicated an intent to do so.

1      THE COURT: - - the witnesses. Mr. Susee can interview the
       witnesses, yes.
2            SPEAKER/MOTHER: Okay.
             MR. SUSEE: I have not interviewed them yet, but I do
3      interview all witnesses before trial.
                              * * *
4            THE COURT: I don't know if Mr. Kelly can set up the
       interviews between now and the plea cutoff deadline, at least for
5      some of the eye witnesses. The police officers are usually a waste of
       time to interview them.
6            MR. KELLY: I can do that best I can with that, Judge.

7  (Exhibit X, R.T. 5/8/7 at 10, 12.)

8         Petitioner points to the motion to continue on June 6, 2007 as evidence that

9  witnesses were not being interviewed.  In that motion, counsel reported:

10            Counsel requested interviews with all of the witnesses the state has
              noticed and to date interviews have been completed with only two
11            of 13 of the state's witnesses. Counsel obtained the appointment of a
              private investigator through OCC for the purpose of tracking down
12            and interviewing 7 or 8 of the defendant's witnesses; to date the
              investigator has had trouble locating and interviewing any of the
              witnesses.
13
   (Reply, Doc. 35, Exhibit AAA, Mot. Continue at 1.)[13]
14
          Petitioner points to cross-examination of prosecution witnesses to suggest that
15
   counsel had interviewed only those witnesses. (Reply, Doc. 35 at   (citing Exhibit T, R.T.
16
   7/24/7 at 67 and 92).)  However, that does nothing to show a failure to interview the
17
   defense witnesses.
18
          One might be tempted to assume that such interviews were not conducted or that
19
   such testimony would have been proffered had counsel asked.   Indeed, Petitioner
20
   attempts to shift the burden of proof to Respondents to show that an adequate
21
   investigation was performed, by casting Respondents' arguments to the contrary as
22
   "speculation."[14] (Supp. Rely, Doc. 52 at 16.) But, the presumption that must be applied
23
   under *Strickland* is that counsel did interview and ask, and the burden is on Petitioner in
24

25  [13]  Indeed, the billings for the investigator included interviews and phone calls with
    defense witnesses on June 21 and 30, 2007, and July 11, 2007.  (*Id.* at Exhibit BBB,
26  Investig. Billing.)  The record does not reflect, however, that such billings were made
    part of the state court record.
27  [14]  Petitioner similarly complains that trial counsel had failed to produce his file.  (Reply,
    Doc. 35 at 34.) However, the referenced records are not shown to have been part of the
28  state court record.  Moreover, the failure to produce the file would create only the barest
    inference that counsel did not interview the witnesses.

30

this habeas proceeding to show that counsel did not.

Moreover, assuming any inference on trial counsel's investigation could be drawn from Petitioner's witnesses' affidavits, such inferences would have to be evaluated in light of the fact that the affidavits were given by close relatives some five years after trial.

Further, the affidavit by C.M. contends that Petitioner wore the following hand jewelry: a silver ring, a silver bracelet, and a silver watch.  In contrast, C.M.s testimony at trial referenced only a ring.

> Q. Do you know if he had anything shiny in his hands of any sort that might have been mistaken for  metal or a weapon?
> A. Yes.
> Q. What was that?
> A.  He always wears a shiny ring on his right hand.

(Exhibit V, R.T. 7/26/7 at 17.)  Thus, at trial C.M. did not testify consistently with what he now avows.

In sum, Petitioner proffers nothing to show that trial counsel failed to conduct an adequate investigation.

**Failure to Adequately Argue Jewelry** – Petitioner also argues for the first time in his reply that trial counsel barely addressed the jewelry in closing (Reply, Doc. 35 at 34-36).  It is true that counsel's argument on jewelry was limited:

> A dimly lit bar with strobe lights flashing and a fight going on, any number of things could cause the flash she says she saw, including jewelry on [the victim's] or Robert's hand, belt buckle, a bottle, just about anything, a strobe light.

(Exhibit V, R.T. 7/26/7 at 45.)  In context, however, limiting the focus on jewelry was a reasonable strategic choice.

The plain import of defense counsel's argument to the jury was that the prosecution's witnesses either did not or could not have seen a knife (even had one been used), and that their testimony was not credible.

> None of the witnesses other than [the victim] saw a knife. They only saw a motion that [E.J., the other bouncer] told us looked like Robert was faking the presence of a knife.
> ***

Now, in addition to those elements, because the observations of the witnesses are so important in this case because that's all you have, you saw I made a big issue of the light and sound problems in that bar that night. I'd like to review those problems, as well as the statements, the inconsistencies and the problems with the witnesses we heard.

\*\*\*

As [E.J.] told you [E.J.] was the closest person to that confrontation who was paying attention to it. He never saw a knife and he was even in a better position to observe that sort of thing than [the victim] himself was because we're told that [the victim] was so close that you couldn't see between the two. And he suggested to us, [E.J] did, that it looks as if Robert was facing pulling out a weapon from his back belt, but [E.J.] never saw one so he appeared to believe that it had been faked.

That is consistent with the testimony of [N.C.] who saw the gesture but not the knife and she did not report -- she did not testify that she saw something shiny, as the county attorney said earlier…She tried her best to tell us, the party line, that there was a knife or there was something that looked like it could be a knife, but she was stopped by the fact that she earlier failed to mention anything about a shiny thing when she talked to the police officers. And we do know that [E.J.] and [the victim] had a conference of some sort after the incident before they talked to the police.

\* \* \*

[N.C.], she claimed she saw the confrontation that took place between Robert and [the victim] and describes the same as [E.J.] did. The two of -- the closest two witnesses to the incident, they both say they saw a gesture but they saw no knife. She claims the person involved in the argument with the woman was Robert Navarro. Everyone else says that person was [A.G.]. She says the argument between the two was in Spanish yet you heard Robert does not speak Spanish. So she was wrong when she was making those statements.

She told us she had a profile view of the confrontation and that the two men were so close together, you could not see between them, yet at trial, she saw Robert Navarro make a gesture with his right hand towards [the victim's] stomach. She said -- and I don't know what it means when a witness is giving you -- telling you believe her when she said the things that help us, don't believe her other lies.

\* \* \*

Now, [S.C] told us that Robert Navarro used his left hand to threaten [the victim] and stab at him. She even stood up and demonstrated for us. We were told by Robert's brother that he is right-handed. It doesn't take much to figure out if these two people were against the wall here with Robert standing here facing the wall, that if he used his left hand, nobody saw anything. Nobody in the bar could have seen what he did or didn't have in his hand because it would have been obscured by the two bodies, yet they told us they saw something. So obviously she was either wrong or she saw nothing whatsoever and nobody else did.

[S.C.] was halfway across the bar from the incident.  She told us, in looking at the picture here, that she was way over here in the area of the tables with a half wall in between her. Also in between were the people that were scuffling as well as the lighting problems,

et cetera, yet she claimed she saw things people right next to the confrontation do not claim they saw. She never reported seeing something shiny, particularly the things she described at trial, when she first spoke to the police. We heard that from Officer Robinson.

A dimly lit bar with strobe lights flashing and a fight going on, any number of things could cause the flash she says she saw, including jewelry on [the victim's] or Robert's hand, belt buckle, a bottle, just about anything, a strobe light. One can only assume she was involved in the same discussion with [the victim] and [E.J.] that led [E.J] to come in and say he saw a knife.

(Exhibit V, R.T. 7/26/7 at 37, 39-40, 42, 44-45.)

For counsel to linger on what might have been seen but mistaken would have detracted from the main thrust that the witnesses lacked the ability to perceive anything, and were demonstrated liars.  Worse, it could have added credibility to the witnesses by providing detail to what counsel argued they simply could not see.

Moreover, the evidence before the jury on jewelry was limited to the testimony of Petitioner's brother-in-law, C.M., that Petitioner wore a ring that might have been mistaken for a knife.  However, C.M. testified that he did not observe the incident.

Q. Did you see any kind of a confrontation that took place between Robert and the man that carded you at the door, the bouncer?
A. No.
Q. You weren't there when that happened?
A. No.

(Exhibit U, R.T. 7/25/7 at 176.)  Thus, counsel was armed only with speculation by a witness with close ties to Petitioner to try to argue that the claims of seeing a knife were only a flash from Petitioner's jewelry.

Petitioner argues that counsel's strategy was to argue everything, which amounted to no strategy.  (Supp. Reply, Doc. 52 at 18-19.)  However, Petitioner's argument relies upon cases discussing the importance of winnowing out weaker arguments when counsel is arguing to a court.  *See e.g. Holemen v. Ryan,* 2013 WL 3716603, *29 (D.Ariz. July 15, 2013) (omitted bases to exclude photo lineup as unduly suggestive); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989) (arguments on appeal).  While that is an important consideration (for example) on appeal, where the defendant bears the burden of persuasion on precise issues as to an entire panel of judges, at trial the defendant need

only open one or more cracks of doubt, upon which jurors need not even be in agreement.  You can't build a boat with a shotgun, but you can sink one with it. Thus, at trial, winnowing could reasonably be considered a poor strategy, particularly if, as here, none of the arguments were plainly stronger than another.

Under these circumstances, the undersigned finds that the available record plainly shows that counsel's failure to belabor the jewelry issue could have been a sound strategic decision.   Thus, Petitioner has failed to establish deficient performance by counsel.

**Summary** – With the evidence cognizable in this Court, it is perfectly clear that Petitioner has no chance of obtaining relief on his claim of ineffectiveness related to the jewelry, and this claim should be denied on the merits.

## 4  Merits of Claim of Ineffectiveness re Misidentification

In his next ground for relief, Petitioner argues that trial counsel was ineffective when he failed to press the purported misidentification of Petitioner as the assailant. Petitioner points to two topics of evidence as fodder for an assertion of misidentification: (1) the victim claimed his assailant had screamed out "brown pride" while threatening him, but that statement was later attributed to one of Petitioner's companions, D.H..; and (2) the other bouncer, E.J., could not identify Petitioner as the assailant.

Respondents counter that counsel did argue to the jury the potential for misidentification, the inability of the other bouncer to identify Petitioner, and a variety of other pieces of evidence to show the potential for a misidentification.  (Amend. Supp. Ans. Doc. 46 at 17-18.) Respondents further argue that the evidence would not support the argument based on the potential for other participants to have also yelled "brown pride," and pursuing the matter it would have highlighted D.H.'s identification of Petitioner as the one involved in the altercation with the victim.  (*Id.* at 19.)  Respondents further argue an absence of prejudice.  (*Id.* at 29-20.)

Petitioner replies that the Respondents merely speculate about others yelling

"brown pride," and that trial counsel failed to investigate other evidence of misidentification. (Supp. Reply, Doc. 52 at 19.)

**Limited Investigation**- Petitioner's assertion regarding counsel's failure to investigate other evidence of misidentification (beyond what has been developed in the record) is ineffective because Petitioner can point to no part of the existing record to show what additional investigation would have produced beyond the unfruitful evidence addressed hereinafter. *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (claim of failure to investigate must be supported with expected results of investigation).

**Deficient Performance in Presenting Evidence** – Petitioner also fails to show that counsel performed deficiently with regard to the available and identified misidentification evidence.

The record reflects that trial counsel argued identification problems to the jury. He argued that N.C. identified Petitioner as the assailant, but also identified him as the one engaged in the initial altercation among patrons, contrary to the testimony of every other witness that Petitioner was not involved at that point. (Exhibit V, R.T. 7/26/7 at 42.) He argued that the show-up identification procedures were suggestive. (*Id.* at 48.)

More particularly, counsel argued that the other bouncer, E.J., was unable to identify Petitioner at trial.

> [E.J.] also told us that he heard [N.C.'s] answers to Sergeant Myer in the patrol car at the traffic stop, and that, contrary to what the police told us, she did not identify anyone at the traffic stop as a man or the man with the knife, and you all heard [E.J.]was unable to identify Robert Navarro in this courtroom. He doesn't even know if this was the man that he saw there that night.

(*Id.* at 47.) Petitioner does not suggest what else trial counsel could have done to exploit this point.

Petitioner complains in his Reply that the waitress, S.C., identified Petitioner but was the furthest away from the altercation. (Reply, Doc. 35 at 43.) But counsel cross-examined S.C. at length on her vantage point. (Exhibit T, R.T. 7/24/7 at 94-100.) And argued it at closing. (Exhibit V, R.T. 7/26/7 at 44-45.)

Petitioner complains that the witness N.C. had not reported any altercation involving the victim in her initial statement to police, nor had the victim reported being threatened by Petitioner. (Reply, Doc. 35 at 43.)   But counsel elicited those very points in his cross-examination of N.C. (Exhibit T, R.T. 7/24/7 at 61-63.)  And, he argued them at closing. (Exhibit V, R.T. 7/26/7 at 43-44, 60.)

Petitioner complains that the victim identified his assailant as the person shouting "brown pride," which D.H. admitted he had done.  The undersigned finds nothing to demonstrate effort by counsel to exploit the "brown pride" issue.  At trial, the victim testified that during the altercation, Petitioner "started screaming out, brown pride." (Exhibit T, R.T. 7/24/7 at 120.)  In contrast, on examination by trial counsel, Petitioner's stepbrother, D.H., testified that he was the one "yelling Brown Pride in that bar" and that he had not heard Petitioner saying that.    (Exhibit U, R.T. 7/24/7 at 157.)  But pursuing such an assertion would have been of dubious value because D.H. had himself identified Petitioner as the one involved in the altercation with the victim. (*Id.* at 146-148.)

Indeed, the evidence was overwhelming that Petitioner had been involved in the altercation with the victim.  In addition to the prosecution eyewitnesses, Petitioner had admitted to the arresting officer that he had been at the bar, and involved in at least the greater altercation.  (Exhibit U, R.T. 7/25/7 at 67-68.)  His stepbrother, D.H. identified Petitioner as the assailant.  Petitioner's other witnesses were of no more assistance.  Petitioner's co-worker [P.H.] denied having seen any altercation, having been in the bathroom until Petitioner was leaving the bar, albeit with the bouncer coming along behind. (*Id.* at  116-118.)  Worse, Petitioner's brother-in-law, C.M., denied seeing the altercation with the victim, but testified that at the same time he was focused on D.H., who he was trying to extricate from the argument with the other patrons. (*Id.* at 14-17.)  Thus, by inference, C.M. essentially testified that D.H. (who admittedly uttered the "brown pride" statement) was not the person involved in the altercation with the victim.

Therefore, it is understandable that trial counsel's approach was not to directly assert that Petitioner was not involved in the incident with the victim, whether through

the other bouncer's inability to identify Petitioner or the dispute over the "brown pride" statement, or otherwise, but to instead focus on the lack of evidence of a knife or a threat. Such a choice was plainly a reasonable strategic choice.

**Summary re Misidentification** - Based on the foregoing, it is perfectly clear that Petitioner has no chance of obtaining relief on his claim of ineffectiveness related to the misidentification, and this claim should be denied on the merits.

## 5.  Merits of Claim of Ineffectiveness re Impeachment of Victim

Next, Petitioner argues that trial counsel was ineffective for failing to impeach the victim with his prior criminal history. (Amend. Pet. Doc. 7 at 16, *et seq.*)  In support of that argument, Petitioner points to a raft of prior investigations, convictions, plea agreements, presentence reports, warrants, arraignments, probation violations, etc.  (*See* Exhibit KK, Amend. 2nd PCR Pet. at Exhibits N through WW.)[15]

Respondents argue that Petitioner cannot show deficient performance because at trial the victim admitted a 2000 felony conviction for theft and being on probation, and that the balance of the convictions proffered by Petitioner were either precluded by the Arizona Rules of Evidence, or collateral in light of the felony conviction the victim admitted.  (Amend Supp. Ans., Doc. 46 at 40-44.)  Respondents further argue that in light of the evidence, Petitioner cannot show prejudice. (*Id.* at 45, *et seq.*)

Petitioner replies there are factual issues as to whether the other offenses were admissible, and because at least some of it directly relates to the victim's truthfulness, failure to pursue it resulted in prejudice.  (Supp. Reply, Doc. 52 at 17-18.)

**Prior Criminal Proceedings** – Petitioner points to the following specific sources of impeachment evidence:

1. the victim's 2000 conviction for theft from an employer, and resulting plea

---

[15] The copies of the Amended 2nd PCR Petition provided by Respondents (Exhibits KK and VVV) do not supply the attached exhibits.  The index of Exhibits, however, reflects the attachment of the exhibits appended to Petitioner's Amended Petition in this proceeding (Doc. 7).

agreement, intervening failure to appear, and probation;

2.   the victim's 2000 dismissed prosecution on a charge of giving false information to a police officer;

3.   the victim's 2002 probation violation for absconding and failing to pay restitution, resulting arrest and extension of his term of probation until March 8, 2007 and incarceration as a term of probation;

4.   the victim's 2000 domestic violence investigation and resulting deferred misdemeanor prosecution, failure to complete an anger management program, guilty plea to probation violation and resulting 10 day sentence.

Petitioner also points to a series of post-trial matters involving the victim.   The reasonableness of counsel's actions is judged from counsel's perspective at the time of the alleged error in light of all the circumstances.   *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).   Those subsequent troubles of the victim were, of course, not available to trial counsel, and are irrelevant to trial counsel's effectiveness.

Petitioner relies upon Arizona Rules of Evidence 404, 608, and 609 as bases for introduction of this evidence.   They will be addressed in reverse order.

**Rule 609 – Prior Convictions** - Arizona Rule of Evidence 609 limits impeachment of witnesses with prior convictions to either felonies, or other crimes based on a "dishonest act or false statement."  Ariz. R. Evid. 609(a).[16]

Theft Conviction – Here the only qualifying conviction was the victim's 2000 felony theft conviction.   It is true that the conviction was a "class 6 Undesignated felony," (Amend. Pet. Doc. 7, Exhibit T, M.E. 2/15/00) with the potential for redesignation as a misdemeanor.   However, Arizona's Rule 609 does not distinguish based upon the designation of the offense, nor even the actual sentence, but based upon whether the offense "was punishable…by imprisonment for more than one year."  Ariz. R. Evid. 609(a)(1).   A Class 6 Felony was, in 1999, punishable by at least 1.5 years in

---

[16] Convictions may not be used if they are more than 10 years old (or release from confinement was more than 10 years before) unless its probative value "substantially outweighs" its prejudicial effect; and prior notice is given.  Ariz. R. Evid. 609(b)

prison.  Ariz. Rev. Stat. § 13-702(A) (eff. thru Sept. 20, 2006).  That it could be left undesignated did not alter that fact.  *See* Ariz. Rev. Stat. § 13-702(G) (eff. thru Sept. 20, 2006).  Thus, this conviction qualified under Rule 609(a)(1) despite the fact that at the time of trial it was an undesignated offense.  *See State ex rel. Romley v. Martin*, 203 Ariz. 46, 48, 49 P.3d 1142, 1144 (Ct. App. 2002) *aff'd*, 205 Ariz. 279, 69 P.3d 1000 (2003).

Thus, the victim could properly be impeached with his 2000 theft conviction. And he was, first by the prosecution and then by trial counsel.  (*See* Exhibit U, R.T. 7/247/ at 124, 128.)

It is true that trial counsel did not delve deeply into that conviction.  But not doing so could have been a reasonable tactic.  Had the underlying circumstances have been pursued, there was the potential for disclosure of the fact that the victim had volunteered information about his thefts to the police; and that the bulk of the money taken had been used to pay other employees of the business for working, with the expectation of later repaying the moneys out of his own funds.  (Amend. Pet., Doc. 7 at Exhibit N, Present. Report.)  Indeed, the prosecutor recommended probation for the victim because "he did confess and readily volunteered to make restitution."  (*Id.* at Recommendation.)

Other Criminal Proceedings - On the other hand, the victim's 2002 probation violation was not a criminal conviction.  Nor was the dismissed false information prosecution.  Accordingly, they did not qualify for impeachment under Rule 609(a).

Nor has Petitioner shown that the victim's 2000 domestic violence prosecution resulted in a conviction punishable by more than one year in prison.  To the contrary, the victim pled guilty to misdemeanor charges of damage to property under Ariz. Rev. Stat. § 13-1602(A)(1), in Chandler City Court.  (Amend. Pet., Doc. 7 at Exhibit KK, Pet. Revoke.)  That Court's jurisdiction was limited to offenses with a maximum punishment of sixth months in jail.  *See City Court of City of Phoenix v. State ex rel. Baumert*, 115 Ariz. 351, 353, 565 P.2d 531, 533 (Ct. App. 1977).  Accordingly, this conviction was admissible under Rule 609(a)(2), but only if "the court can readily determine that

establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement." *Id.* However, criminal damage requires no such showing. *See* Ariz. Rev. Stat. § 13-1602(a)(1) (eff. thru June 29, 2009). Therefore, this conviction was not admissible under any portion of Rule 609(a).

**Rule 608(b) – Other Prior Bad Acts re Character for Truthfulness** - Petitioner also argues that all four matters were admissible under Arizona Rule of Evidence 608(b). Petitioner argues even if Rule 609 is limited to criminal convictions, that Rule 608(b) extends to probation violations and other matters. (Supp. Reply, Doc. 52 at 17.)

Indeed, Rule 608(b) authorizes cross-examination on "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." (The rule precludes "extrinsic evidence" of such matters, unless they are criminal convictions permitted under Rule 609.)

Probation Violations - Respondent argues, however, that probation violations are not probative of truthfulness, and therefore do not come within Rule 608(b). In support of that contention, Respondents cite two federal cases, applying the similar Federal Rule of Evidence 608. (Amend. Supp. Ans., Doc. 46 at 41 (citing *U.S. v. Morrow*, 2005 WL 3163801 (D.D.C. June 2, 2005) and *U.S. v. Brown*, 606 F.Supp. 2nd 306, 315 (E.D. N.Y. 2009)). *See also U.S. v. Vasquez* , 840 F.Supp.2d 564 (E.D. N.Y. 2011), and cases cited therein; *United States v. Perkins*, 287 Fed. Appx. 342, 349-50 (5th Cir. 2008); *United States v. Brown*, 927 F .2d 406, 408 (8th Cir.1991) (Rule 609 "bears little or no relation to prior arrests, pending indictments, plea agreements, and probation violations"); *Hyppolite v. Collins*, 2015 WL 269219, at *2 (D. Conn. Jan. 21, 2015) ("violation of probation does not constitute a dishonest act or false statement"); *United States v. Colella*, 1989 WL 89212, at *4 (E.D. Pa. July 26, 1989).

Petitioner complains that these federal cases were not binding in the Arizona courts. However, Petitioner ignores the correlation between the Arizona Rules of Evidence and the Federal Rules of Evidence. "The Court has generally adopted the

federal rules as restyled, with [specified] exceptions."[17]   Ariz. R. Evid. Prefatory Comment.   "Where the language of an Arizona rule parallels that of a federal rule, federal court decisions interpreting the federal rule are persuasive but not binding with respect to interpreting the Arizona rule."  *Id.*

Moreover, the rational in Respondent's authorities is persuasive: "that violations of probation, conditions of release, and escape are not probative of a witness's character for truthfulness or untruthfulness, and therefore fall outside of the parameters of Rule 608(b)."  *Morrow*, *supra* at *4.

Under the landscape of Rules 608 and 609, criminal felony convictions are the only criminal proceeding which are presumed to have relevance to credibility.   As discussed hereinabove, all other such convictions are admissible only "if the court can readily determine that establishing the elements of the crime required proving…a dishonest act or false statement."  Ariz. R. Evid. 609(a)(2).   This distinction derives from the history of Rule 609.

> Like its federal counterpart, Rule 609(a) traces its origins to the common law's total prohibition on the testimony of those previously convicted of "crimes of infamy": treason, felonies, and *crimen falsi*. The common law's absolute prohibition eventually evolved to allow such testimony but permitted impeachment of a witness's credibility with the existence of prior convictions for such offenses. The purpose of the rule is to allow the fact-finder to weigh the witness's testimony by his or her general credibility and veracity. "Conviction of a felony is material to a witness's credibility."

*State v. Hatch*, 225 Ariz. 409, 411-12, 239 P.3d 432, 434-35 (App. 2010) (citations omitted).   So, while a presumption of relevance to credibility applies to a felony conviction, it does not apply to misdemeanor convictions.   Nor does it apply to mere probation violations.

Petitioner points to no authority permitting the use of probation violations to impeach a witness.   The states appear to almost uniformly reject the use of probation violations for impeachment.  *See State v. Jenkins*, 299 N.J. Super. 61, 75, 690 A.2d 643,

---

[17]   Arizona Rule of Evidence 404 is the one relevant rule departing from the Federal Rules of Evidence.  Ariz. R. Evid. Prefatory Comment.

650 (App. Div. 1997) (reviewing decisions from Alabama, Connecticut, and Massachusetts, and disapproving of lower court authority to the contrary, but permitting evidence of the sentence imposed upon such violation in conjunction with admission of evidence of the underlying conviction). *See also Indoccio v. M & A Builders, LLC*, 372 S.W.3d 112, 118 (Tenn. Ct. App. 2011) (probation violation not basis for impeachment).

The two exceptions appear to be Ohio and North Carolina. Ohio permits impeachment with probation violations, reasoning that "violation of probation is probative evidence of a witness' character for truthfulness or untruthfulness since such a violation also involves a failure to keep one's promise to observe certain terms and conditions." *State v. Moore*, 2000 WL 329832, at *4 (Ohio Ct. App. Mar. 6, 2000). *See also State v. Bessick*, 1996 WL 570902, at *5 (Ohio Ct. App. Sept. 11, 1996). But here, Petitioner fails to show that the victim's probations involved a promise to comply. In his theft conviction, the victim's probation clearly did not involve any promise to comply with the terms of probation, only an acknowledgement of the conditions and the potential of penalties for their violation.[18] (*See* Amend. Pet., Exhibit W, Suspension of Sentence and Conditions of Probation.) *Cf. Ariz. Rev. Stat. Code of Judicial Administration § 6-207* and Appendix A thereto (Uniform Conditions of Supervised Probation Form) (requiring agreement to abide by conditions of probation, but applicable only to probationers of the superior courts, or "referred by a limited jurisdiction court to the superior court probation department for supervision"). Thus, Ohio's reasoning would not appear applicable to Petitioner's probation.

Moreover, at least one federal court has rejected this broken-promise based reasoning. *See United States v. Perkins*, 287 Fed. Appx. 342, 349-50 (5th Cir. 2008) ("probation violation…does not speak to his truthfulness, but is merely a broken promise

---

[18] The separate Judgment and Orders for Restitution, Fines and Fees did include an "agree[ment] to comply with all directives contained therein." (*See* Amend. Pet., Exhibit W.) However, Petitioner does not argue counsel should have impeached the victim with violation of this separate agreement to pay restitution.

which indicates a lack of loyalty to commitments").[19]

The other apparent exception, cited in *Jenkins*, is North Carolina.  In a terse, two paragraph opinion, the North Carolina Court of Appeals has held "[i]t was within the trial judge's discretion to allow cross-examination regarding violations of the terms of probation and the defendant's failure to disclose criminal activity. Both of these matters tend to cast light on the character of the witnesses."   *State v. Wilkins*, 34 N.C. App. 392, 398, 238 S.E.2d 659, 664 (1977).   The North Carolina court cited no authority for its proposition, did not identify the rules being applied, and the holding appears to have been largely ignored outside the *Jenkins*  decision and the other New Jersey case *Jenkins* overruled.

Petitioner proffers nothing to suggest that Arizona would not be persuaded by the weight of the state and federal authorities. Indeed, Arizona has held that cross-examination on a violation of a court order may properly be excluded under Arizona Rule of Evidence 608(b) based upon a determination "that such evidence was not 'probative of truthfulness or untruthfulness.' "  *State v. Reyes*, 146 Ariz. 131, 134, 704 P.2d 261, 264 (Ct. App. 1985) (violation of order preventing discussion of case among prosecution witnesses).

At a minimum, trial counsel could have reasonably concluded that the trial court would have done so, and that attempts to utilize such evidence would have been futile.

False Information Charges - With regard to the charges of providing false information, Petitioner fails to establish that there was any crime to be argued.  The charges were dismissed.  (Amend. Pet., Doc. 7 at Exhibit P at 2.)

Petitioner argues that the victim lied to police about not having his drivers license with him when he was arrested on the theft charge.  Petitioner argues that the victim in fact had two licenses with him at the time (one a replacement for the other believed to have been lost), and eventually admitted that he had not produced the license because it

_____

[19]  Arguably, the broken-promise reasoning would permit the impeachment of a witness with all manner of broken promises, such as unpaid debts, broken engagements, etc.

had been suspended for failure to pay a ticket.  (Reply, Doc. 35 at 47-48.)

Attempts to utilize such evidence could have been countered with disclosures of Petitioner's ultimate ready confession to officers on both the theft and the false information charges.  Trial counsel could have reasonably concluded that the impression left with the jury would have been of a poor liar, who might initially attempt to avoid responsibility for a wrong but rapidly recants and confesses.  At best, the jury might have considered this irrelevant to a situation (such as the instant prosecution) where the victim had never been accused of a wrong.  At worst, this might lead the jury to place greater weight on the victim's trial testimony, rather than less, given his apparent inability to persist in a falsehood.  Indeed the sanitized version of the victim's theft conviction could have reasonably been deemed by counsel to be the most impeaching of the victim's credibility.

Thus trial counsel could have made a reasonable tactical choice to not pursue allegations that the victim had provided false information to the officers.

Reports on Domestic Violence Offense – Petitioner argues that the victim misrepresented his actions to police in the domestic violence investigation.  Petitioner argues that the victim reported to the police that in his argument with his girlfriend he had pushed her to the ground and had started to hit her, but stopped himself. (Amend. Pet., Doc. 7, Exhibit BB, Chandler Police Report 1/19/00 at 7.)  In contrast, the victim described being grabbed, tripped, body slammed into the wall, and choked.  (*Id.* at 6.) Petitioner recognizes, however, that the victim was "being evasive with police officers about the incident."  (Reply, Doc. 35 at 55.)  Even so, trial counsel was armed only with a third party's disputed description of the event and the officers' report that he observed "redness" on the victim's "neck as well as on her arms."  Petitioner's victim was never convicted of assaulting the victim, but only of damage to property.  (Amend. Pet., Doc. 7, Exhibit GG, Plea Agreement 7/13/01.)

With regard to the latter, Petitioner's victim had admitted to the police that he had thrown his girlfriend's "VCR out of the open arcadia door" and "grabbed the phone an

also threw it out the door." (Amend. Pet., Doc. 7, Exhibit BB, Chandler Police Report 1/19/00 at 7.) Thus, again, attempts to rely upon the domestic violence events to impeach the victim may have backfired, resulting in reaffirming the victim's willingness to admit conduct to the police with potential detrimental consequences. Trial counsel could have made a reasonable strategic decision to forego that risk.

<u>Other Proceedings</u> – The victim's theft conviction was admissible under Rule 609, and Petitioner proffers nothing to show reliance on Rule 608 would not have altered the proceedings.

Petitioner points to nothing else in the victim's conduct in the other criminal proceedings that establishes the victim's character for truthfulness. They may show that he is violent, and irresponsible. But they don't show a lack of truthfulness. Thus, they would not have been admissible for impeachment under Rule 608(b).

**<u>Rule 404 – Evidence of Pertinent Trait</u>** - Petitioner argues that in addition to utilizing the victim's criminal record as impeachment under Rules 608 and 609, some such evidence was admissible under Arizona Rule of Evidence 404(a)(2), which permits evidence of a trait of character of the victim.

<u>Inapplicable to Truthfulness of Witness or Violence of Victim</u> - In particular, Petitioner points to the victim's false information charge, felony theft conviction, and the incidents surrounding those prosecutions as evidence that the victim "has a character trait for untruthfulness." (Reply, Doc. 35 at 47 *et seq*., 49 ) However, such evidence is not related to a "pertinent trait of character of the victim" within the meaning of a Rule 404(a)(2). That Rule is relevant to such things as honesty and truthfulness of an accused or victim only when relevant to their position as accused or victim, e.g. when the elements of the crime involve dishonesty. Where it is simply the character of such a person in their role as a witness, Rule 404(a)(3) directs that such evidence is controlled by "Rules 607, 608, and 609."

Petitioner argues in his Amended Petition that the victim's record reflects that he had "an extensive and violent criminal history, and a motive to fabricate his version of

events." (Doc. 7 at 28.)   Petitioner did not contend that he acted in self-defense. Moreover, Petitioner proffers nothing to suggest that he was aware of the victim's history at the time of the altercation. *See State v. Fish*, 222 Ariz. 109, 121, 213 P.3d 258, 270 (App. 2009) ("specific act evidence is not admissible to show a defendant's state of mind unless the defendant was aware of the victim's prior acts at the time of the altercation").   Accordingly, the victim's history for violence or general criminal history would not be a "pertinent trait of character" for purposes of admission under Rule 404(a)(2).[20]

Motive to Lie - Petitioner argues that the fact that the victim was on probation, with a potential for an 8.75 year prison term upon a violation, provided evidence of a motive to fabricate "his version of events to shift as much responsibility for the incident at the Wild Hare off of himself and on to others."   (Amend. Pet. Doc. 7 at 24.) Purportedly, Arizona permits admission of bad act evidence "under Rule 404(b) to attack the credibility of a witness when the evidence tends to show a motive to lie." *State v. Riley*, 141 Ariz. 15, 20, 684 P.2d 896, 901 (App. 1984).  *See also State v. Sanchez-Osuna*, 2010 WL 785844, at *3 (Ariz. Ct. App. Mar. 9, 2010).  The law, however, is not so clear.

Under the Federal Rules of Evidence, a motive to lie is not the type of motive within the contemplation of Rule 404.  "Although Rule 404(b) does allow evidence of 'other crimes, wrongs, or acts ... as proof of motive ...,' the word 'motive' as used in the rule does not refer to a motive to testify falsely.   *United States v. Farmer*, 923 F.2d 1557, 1567 (11th Cir. 1991).  *See also United States v. Sampol*, 636 F.2d 621, 659 n. 24 (D.C.Cir.1980) ("The witness's motive to testify falsely ... is merely an aspect of credibility [controlled by Fed.R.Evid. 608]. 'Motive' in the context of Rule 404(b) refers to the motive for the commission of the crime charged.").  Although Arizona Rule of Evidence 404 differs in some respects from its Federal counterpart, the essentials of

---

[20] In disposing of the related claim of innocence, the PCR court concluded: "Mr. [O's] alleged 'violent character' is not relevant and not so material as it would probably change the result."  (Exhibit OO, Order 5/6/13 at 5.)

Arizona Rule 404(b) are largely derivative of Federal Rule 404(b)(1) and (2).  Both include the same relevant language, that bad act evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *See* Ariz. R. Evid.  404(b); Fed. R. Evid. 404(b)(2).  Moreover, other states have similarly excluded motive to lie from their comparable evidentiary rules.  *See e.g. Chew v. State*, 804 S.W.2d 633, 643 (Tex. App. 1991).  *But see Davis v. Alaska*, 415 U.S. 308 (1974) (denial of right of confrontation to prohibit defendant from cross-examining prosecution witness on probation for purposes of arguing bias because of fear of possible probation revocation); and *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (even under *Davis*, cross-examination may be limited to avoid "harassment, prejudice, confusion of the issues" etc.).

Arguably, despite their language, both *Riley* and *Sanchez-Osuna* did not actually apply Rule 404(b).  Neither directly involved evidence of a prior bad act to prove motive to lie, but rather evidence of favors in criminal prosecutions for such bad acts.  Here, Petitioner does not suggest that the victim was being afforded such favors.

Further, *Riley*'s reference to 404(b) was merely *dicta*, the holding of the case having been that despite any presumptive admissibility, the trial court had properly limited what had been a far ranging cross-examination of the witness on the underlying bad acts.

Even if *Riley* were deemed to *hold* that 404(b) applied to motive "to lie," "inherent in the rule [permitting bad act evidence to show motive to lie] is the assumption that the motive may be shown."  *Riley*, 141 Ariz. at 20, 684 P.2d at 901. Petitioner fails to suggest what conduct by the victim potentially subjected him to a probation violation, or how alleging Petitioner's possession of a knife would alter that.

The evidence at trial proffered nothing to suggest that the victim had acted criminally, as opposed to simply being engaged in his legitimate role as a "bouncer" to defuse the brewing conflict among the patrons, and perhaps defending himself from Petitioner's assault.  The victim testified that in the midst of the confrontation, Petitioner

47

shoved him, he shoved back, and Petitioner drew the knife, at which point the victim withdrew with his hands up.   (Exhibit T, R.T. 7/24/7 at 118-119.)   Petitioner's stepbrother, D.H. testified that the victim "didn't want to fight" Petitioner, and when Petitioner pushed the victim, the victim "just put his hands up." (Exhibit U, R.T. 7/25/7 at 148.  *See also id.* at 161.)

Even if the victim's involvement in breaking up the brewing conflict could somehow have been deemed criminal so as to subject him to a violation of probation, it would have been reasonable for trial counsel to conclude that the jury would not believe that a person who had chosen bar bouncing as a profession would appreciate the risk of prosecution, and that pursuing such evidence would have been unfruitful.

Moreover, there was a risk that even if the jury concluded that such concerns would have been within the victim's contemplation, that they would simply find it an explanation for and reinforcement of the evidence showing that the victim was passive, rather than that he had lied about the knife.  Indeed, the victim testified that he had remained passive because of concerns for his own well-being.  "I remember looking back because I was thinking about just grabbing him but then I was like, you know what, this job is not really worth it for me to risk my life, so I just backed off, and the DJ came down, tried to stop the whole thing." (Exhibit T, R.T. 7/24/7 at 120-121.)

Under these circumstances, counsel could have reasonably concluded that pursuing impeachment of the victim on the basis of his pending probation would have been futile, or tactically unsound.

**Failure to Investigate** – Petitioner argues that trial counsel was ineffective for failing to investigate the victim's criminal history.  However, Petitioner proffers nothing to show that counsel did not investigate.

**Summary re Impeachment** – In sum, Petitioner fails to show a failure to investigate, and with one exception, fails to show any facts from the four criminal prosecutions which were likely to be admissible and free from risks that trial counsel could reasonably concluded justified avoiding the admission of the evidence.  The one

48

exception, the conviction for theft, was introduced, and counsel could have had tactical reasons for not pursuing the matter further.

### 6. Merits of Claim of Ineffectiveness re Lesser Included Offense Instruction

Petitioner argues that counsel was ineffective for failing to insist, over Petitioner's objections, to the giving of a lesser included offense instruction. (Amend. Pet. Doc. 7 at 25-27.)

Respondent concedes that the evidence supported lesser included offense instructions on both: (1) disorderly conduct without the use of a weapon, a misdemeanor with a maximum sentence of six months; and (2) disorderly conduct with a weapon but without intent to injure, insult or provoke, a class 6 felony with a maximum sentence of six years. (Amend. Supp. Ans., Doc. 46 at 24-25.)   Respondent also concedes that Petitioner had the right to insist that the jury be instructed on these lesser included offenses. (*Id.*)  Respondent argues, however, that Petitioner had the right to waive such instructions, and to force the prosecution to prove its case on the charged offense. (*Id.* at 25-26.)    Respondent further argues that counsel properly considered Petitioner's preferences in acquiescing in Petitioner's decision, assuming such were informed strategic choices, even if counsel disagreed with the decision.  (*Id.* at 26-32.)  Finally, Respondent argues that the all-or-nothing approach pursued at Petitioner's request can be, and was, a valid strategy, notwithstanding counsel's subsequent misgivings. (*Id.* at 32-37.)  Finally, Respondent argues that the jury's ultimate conviction of the aggravated assault charge precludes a finding of prejudice, and that the potential that the jury might have disregarded the evidence and convicted of the lesser offense if provided the opportunity, does not qualify as prejudice under the *Strickland* standard.  (*Id.* at 37-39.)

Petitioner replies that counsel's apparent trial strategy was to challenge the existence of the knife, and seek conviction on the misdemeanor lesser included offense. (Supp. Reply, Doc. 52 at 5-6.)  Petitioner contends that counsel failed to discuss the matter with Petitioner, and to explain the strategic consequences of waiving the

instruction.  (*Id.* at 6-7.)

**Failure to Advise Is a New Claim** – Petitioner argues that any reliance by counsel on Petitioner's instructions was not permissible because counsel did not adequately advise Petitioner on the lesser-included instructions offense.  (Supp. Reply, Doc. 52 at 12.)

Distinct Claim - This failure-to-advise claim is not the claim raised in the Amended Petition.  Rather, the claim raised in the Amended Petition was that counsel was defective for failing to insist on the instruction.  The former focuses on counsel's advice to his client.  The latter focuses on counsel's performance in court. The former focuses on Petitioner's decision making process.   The latter focuses on counsel's decision making process. They are distinct claims, and the former was not raised until Petitioner's Supplemental Reply.  The Court will not consider a claim raised for the first time in a reply.  "A Traverse is not the proper pleading to raise additional grounds for relief."  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

Petitioner Relies Upon New Evidence - Moreover, the record before the state court did not address the advice given to Petitioner.  In support of the claim now, Petitioner relies upon a declaration of Petitioner (signed by habeas counsel) which was not prepared until November, 2014.  (*See* Supp. Reply, Doc. 52 at 6-7, citing *id.* at Exhibit NNN.)  Petitioner points to no portion of the record available to this Court in its merits review which would support any finding on the advice given by counsel to Petitioner.

Evidence In the Record – Even if the claim were properly raised now, Petitioner has failed to show, based on the record in the state court, deficient performance by trial counsel.

The trial court record reflects the following exchange:

> MR. SUSEE: Just one item on the jury instructions, Your Honor. I've discussed at length with my client the request for a lesser included offense instruction as the disorderly conduct. My client -- despite my advice to the contrary, my client feels very strongly that he does not want that instruction in there. So on behalf

of him, I am requesting of the Court that we strike that jury instruction. If the Court is inclined to do so, I would invite you to confer with my client, that that's what his intention is or his wishes in this case, and obviously for petition for post-conviction relief reasons, I feel it important to make a record of this.

THE COURT: All right. Normally, the Court doesn't give lesser includeds unless they're requested. I assumed -- you know, we had talked about this. I feel it would be appropriate to give it in this case, but if you're specifically asking the Court not to give it, then, I probably won't.

Let me ask Mr. Navarro, you understand that you don't have legal training regarding the law. You don't have any kind of legal training the way Mr. Susee does, and you understand that it is really to your benefit to give a lesser included based especially on the charge that you're facing that because of the -- if the state proves the greater offense and proves the two prior convictions, you're facing a life term in prison.

With a lesser included, the jury comes back with a finding on the lesser included, then the state proves the prior, it would still result in prison time but not nearly so much, and I am not sure what the range is; I don't have the sentencing chart in front of me, but it would be a lot less time if you were found guilty of disorderly conduct if the jury finds it's a dangerous offense and the state proves the priors. Mr. Kelly, I know we discussed this briefly. I am not sure what the range is for Class 3.

MR. KELLY: Class 6 dangerous, I know the presumptive is three -- presumptive is 3.75 years.

THE DEFENDANT: I believe it's two to seven.

MR. SUSEE: There is a question on that also, Your Honor, because if the jury does not find him guilty of aggravated assault, I would guess in this case it's because they question the existence of a knife which means that a disorderly conduct could be a non-dangerous disorderly conduct in which case my understanding is it's a misdemeanor; it's not a felony. So that would be just a minimal disposition of the case.

THE COURT: That's my understanding also.

MR. SUSEE: The sentencing range on a Class 6 dangerous with two priors is 4.5 to five and a quarter to six and if it's not run through as dangerous, then it ranges from two and a quarter to 5.75 with a presumptive of 3.75. If it is a misdemeanor, obviously, it's a maximum of six months in jail.

THE COURT: Six months county jail, correct.

MR. SUSEE: And that, I guess, was part of my reason why I was trying to convince him that we ought to leave the lesser included in because it could go down as a misdemeanor.

THE COURT: It certainly could, and I know that defendants get to make decisions in cases whether to plead guilty or not guilty, whether to testify or not testify, even though counsel tries to give them the best guidance, but when it comes to deciding what are the appropriate instructions to give to the jury, I guess unless you as counsel in the case are specifically requesting me to withdraw that lesser included, Mr. Susee, I am inclined to give it because I think the evidence supports it and by law it is a lesser included offense. Does the state have any thoughts on that, Mr. Kelly?

MR. KELLY: Judge, of course I'm going go to be arguing for the charge that he's been indicted on,   so I don't have any position. It's fine with me if it's not in the instructions.

THE COURT: Anything further on that, Mr. Susee?

MR. SUSEE: Your Honor, I would ask that you delete that instruction.

THE COURT: If that is the defense's wish, I will certainly do that, and we're looking at page 11 of the instructions. I will delete any reference to the lesser included offense, and also on page 12 at the top delete the definition for disorderly conduct, and then in the middle of the page, if you find the defendant  guilty of the crime of aggravated assault, and I will  delete any language referring to a lesser included  offense of disorderly conduct. It will just read if you find the defendant guilty of the crime of aggravated assault, you must determine whether or not, et cetera, and I think those are the only references in the instructions to --

(Exhibit V, R.T. 7/26/7 at 4-8.)

THE COURT: I know you had originally asked for some lesser includeds on threatening or intimidating     and also endangerment. I did not consider giving those because I don't believe that those would be supported by the law. The elements are different from aggravated  assault, so we did have a discussion regarding that and  I -- as stated previously, the only one I thought would  be a valid lesser would be the disorderly conduct but  since that's been withdrawn, that's moot.  Is there anything from you, Mr. Kelly, regarding the instructions?

MR. KELLY: No, Your Honor.

MR. SUSEE: Your Honor, might I just say with regard to the request for lesser included, including the other ones we didn't address in my statements earlier, I would withdraw my request for any  of the other lesser included instructions for the same line of reasoning,  that we requested the disorderly conduct be withdrawn and that's because my client has  opted to go with the all-or-nothing theory.

THE COURT: Very good. The defendant being fully informed of the consequences that could result from that, then we have made a record on that.

(*Id.* at 10-11.)

Petitioner points to no other parts of the record before the state courts in support of his contentions regarding counsel's advice.

Deficient Performance - The record reflects that counsel had previously discussed the matter with Petitioner.  Counsel began the exchange by advising the court that: "I've discussed at length with my client the request for a lesser included offense instruction as the disorderly conduct. My client -- despite my advice to the contrary, my client feels very strongly that he does not want that instruction in there." (Exhibit V, R.T. 7/26/7 at

52

4.)   Although Petitioner plainly felt free to speak up in the proceeding, Petitioner voiced no objection to counsel's representations to the court that he had advised Petitioner *at length*. *See Schriro v. Landrigan*, 550 U.S. 465, 479 (2007) ("In light of Landrigan's demonstrated propensity for interjecting himself into the proceedings, it is doubtful that Landrigan would have sat idly by while his counsel lied about having previously discussed these issues with him.").   Nothing in the record shows any omissions in that discussion.

Moreover, on the record counsel effectively advised Petitioner on his recommended course of conduct and the reasons for it: "I was trying to convince him that we ought to leave the lesser included in because it could go down as a misdemeanor."   (Exhibit V. R.T. 7/26/7 at 6.)   Petitioner fails to suggest what other advice was required.

Therefore, even if this new claim were properly raised, the undersigned finds it clear that Petitioner has failed to meet his burden of showing, based on the state court record, that counsel performed deficiently in failing to advise Petitioner on the lesser included offense instructions.

<u>Prejudice</u> – Moreover, even if this new claim were properly raised, the undersigned finds that Petitioner has failed to meet his burden of showing prejudice from any deficiency in counsel's advice.

The record before the state court reflects that counsel had advised Petitioner on the lesser included instruction, discussed it in sufficient depth that Petitioner had insisted on rejecting the instruction, and even after a thorough review by the court on the issue, and continued advice by counsel on the record to the contrary, Petitioner persisted in his position.   Petitioner does not suggest what other information beyond that afforded on the record by the court, that he needed to make an informed decision on the matter.

To be sure, Petitioner does complain that his decision to forego the lesser included instruction was an emotional one, based upon his assertions that he had not previously been advised of the matter by counsel.   But, defendants are routinely required to make,

53

and are bound by, difficult decisions made in a courtroom. "Although deadlines, mental anguish, depression, and stress are inevitable hallmarks of pretrial plea discussions, such factors considered individually or in aggregate do not establish that Petitioner's plea was involuntary." *Miles v. Dorsey*, 61 F.3d 1459, 1470 (10th Cir. 1995).[21]

Moreover, this issue was not first raised in the midst of an ongoing discussion in the courtroom, but at the very beginning of the day's proceedings on the record,[22] where prior to the commencement of the proceedings Petitioner had been advised on the lesser included offense instruction and the risks of rejecting it. Counsel related that he had discussed it with Petitioner the day before the hearing:

> **Ed** [Trial Counsel]: Right, you got to take everything with a grain of salt, uh -- when it's a bunch of people in a bar drinking. But, uh, and he, my under-- my recollection is he denied everything. There are two things that he, uh, that I mentioned on the phone that - uh, the jury instructions. Ordinarily, an attorney would just, uh, say here's the jury instructions, etc., uh -- but I can't to, uh, I'm not going to prison so I'll talk to my client and if they have any real strong, uh, leaning one way or another I'll take it into consideration. In this case it was the, uh, the instruction for a lesser included on disorderly conduct and I don't know if you've ever done criminal trials?
>
> **Andrew**: Not trials, no.
>
> **Ed:** I'm very uncomfortable relying on the jury finding that he didn't do the main thing, or -- Anyways; what I've found with jurors is that they tend to like to compromise and if they have any uncertainty as to what happened, and I think there was some uncertaininty in this case, then the lesser included on disorderly conduct gives them an out, where they feel they did their job by convicting him of something.
>
> **Andrew**: Of something, just not ....
>
> **Ed**: On the other hand, not on the main thing. Uh, but uh -- he and, and I took the unusual step of putting it on the record and you probably read it in there.

---

[21] This case may be an example why some argue that attorneys should be mandated to ignore their client's instructions. *See e.g.* Johnson, *The Law's Hard Choice: Self-Inflicted Injustice or Lawyer-Inflicted Indignity*, 93 Ky. L.J. 39, 41 (2005) (arguing a client's right to decide should be limited to a plea, appealing, and testifying). But, as discussed hereinafter, they have as yet not been mandated to do so.

[22] The record suggests that the instructions had been discussed in chambers the preceding day. (*See* Exhibit U, R.T. 7/25/7 at 169 (indicating instructions to be discussed in chambers after the day's proceedings).)

**Andrew**: Yeah.

**Ed**: That I did put on the record the simple fact that he instructed me absolutely no lesser included, he wanted it all or nothing. He thought that, like most clients, most defendants, he thought the jury would acquit him because he said he didn't do it.

**Andrew**: Okay.

**Ed**: Uh, but uh, but I realize that was a really critical thing that he, he absolutely did not want that. He had a right to roll the dice on everything. Uh, maybe he didn't have the right. But in this case I went with his request.   And, anyways I'm trying to remember because there was - - it might have been just the decision to go to trial. And they tell the defendants that you got two choices: Number one, whether you go to trial. Number two, whether you testify. And apparently he didn't testify in this case. And I don't, uh, I think we had enough people telling his story we really didn't need to testify particularly with his priors, situations ...

(Orig. Petition, Doc. 1 at Exhibit G, Sussee Interview at 2.)

**Andrew**: Uh, the lesser included disorderly conduct was originally going to be one of the instructions.

**Ed** [Trial Counsel]: Right

**Andrew**: You then went to talk with Navarro ... he was, you know, adamant that instruction not be given.

**Ed**: Right.

**Andrew**: Urn, you then made the record the next day requesting it not to be given. Can you tell me just a little bit about the discussion with the court ... what that was like, if you remember?

**Ed**: I mean. I'm sure there a written record that, but I can't recall exactly, I can't recall exactly what was said 1 just know that, uh, it was a standard instruction in an aggravated assault case. That I had a problem that every other attorney in the world deals with ...

* * *

**Andrew**: So there was nothing unusual that stands out in your mind about the discussion with the courts or the instructions or anything?

**Ed**: Other than I have never put on the record a client's refusal to let me, uh, ask for a lesser included instruction. I'd never done that before or since. It's just, urn, urn, you know something I never did. But in this case I really thought it was important that we have that, but this guy was pretty strong headed.

**Andrew**: So what was the discussion like with Navarro, when you went back to him, said "here are the jury instructions were considering," he didn't want the lesser included?

**Ed**:  Yeah, I explained to him that my theory is juries like to compromise.  Uh, if they don't think there's something there uh, uh, they like to compromise and I like to give them something they can comprise [sic] on. Because, uh, if it's an all or nothing thing, uh, you stand a real danger of them ... we can't tell the jury this guy is going to prison for twenty five years ...

**Andrew**: Right.

**Ed**: They won't find him guilty. If I were able to tell the jury that, uh, I'm certain they would not have convicted him of this case. Because it was, was not anything that you would send someone to prison, even to send them to prison let alone for twenty five years. I mean it was a stupid thing and, uh, no harm was done, kind of "no harm, no foul."

**Andrew**: So do you feel his insistence that instruction not be given, was that detrimental to his case?

**Ed**: Well I thought it was detrimental to his future, maybe not his case. But uh, I thought the jury should come back with a "not guilty", uh, but I got really pessimistic about juries because they just kind of throw the ball up in the air and wherever it lands, that's where they go. But my experience with juries is that they usually get it right. And in this case, uh, the allegation he had the knife in the bar and threatens with it was backed up by the fact they found the knife matching at least close enough to the description of the knife they used, uh, to just undermine any denial they might have. And for him to just flat deny used the knife when it was found underneath his seat, uh, was, I, you know, I thought was pretty stupid. He should have just ... anyway my…in this case it was too much of a danger of him getting convicted. But if they would've been able to find him guilty of disorderly conduct I thought there was a very real probability that's what the verdict would have been.

**Andrew**: Okay, and you explained that to him that consequence of, if he was convicted of aggravated assault that what he's looking at? And what the, urn, your thoughts were behind providing the jury with the lesser included?

**Ed**: Yeah, obviously any discussion I had with him was not something that was on the record, but that's why I wanted to put it on the record because I thought it was a real mistake.

**Andrew**: Mmm-hmmm.

**Ed**: And I know defense attorneys are responsible for, uh, tasks at trial like that, but on the other uh, hand, this was a case, uh, he should have, I mean he should have let them go with it, just leave it on the record.

**Andrew**: Okay.

**Ed**: But if I made a mistake in the case I guess it was listening to him about that.

(*Id.* at 11-12.)

Further, Petitioner's position was neither irrational nor unprecedented. Defendants with some regularity take an all-or-nothing approach, gambling that if the jury is faced with only the option of the greater offense they will acquit, while if given the option of lesser offenses they may compromise by convicting on the lesser offense. *See e.g. Miller v. Nooth,* 403 Fed. Appx. 291, 292 (9th Cir. 2010) (counsel and defendant "jointly made a strategic decision to pursue an 'all-or-nothing' approach"); *Hooks v. Ward*, 184 F.3d 1206, 1234 (10th Cir. 1999) ("in the context of instructions on lesser included offenses, we see particular strategy reasons why a defendant might not want to present the jury with a compromise opportunity").  *See also* Pflaum, *Justice Is Not All or Nothing: Preserving the Integrity of Criminal Trials Through the Statutory Abolition of the All-or-Nothing Doctrine*, 73 U. Colo. L. Rev. 289, 301 (2002) ("Thus, the All-or-Nothing Doctrine can be an extremely effective strategy for an accused in a trial where the prosecution might have difficulty in proving the accused's guilt beyond a reasonable doubt..").  *See also* Carpenter, *The All-or-Nothing Doctrine in Criminal Cases: Independent Trial Strategy or Gamesmanship Gone Awry?*, 26 Am. J. Crim. L. 257, 258 (1999) ("Because of the nature of the gamble, the [all-or-nothing] doctrine [on lesser-included-offense instructions] conjures up images of a smoked filled room and the high stakes roll of the dice, as trial participants seek either an outright acquittal or conviction on the highest charge sought.").  It may be a gambling man's decision, but some very rational men are gamblers.

Petitioner's contention is that had he been adequately advised, he would not have insisted on foregoing the lesser included offense instructions, counsel would not have requested their omission, the instructions would have been given, and the jury would have selected the lesser offenses.  Based upon the record, the undersigned finds it clear that Petitioner has failed to show a reasonable probability of the very first step in his logic – that with additional advice from counsel Petitioner would have instructed counsel differently.

**Necessity of *Faretta* Hearing is a New Claim** – Petitioner argues for the first time in his Supplemental Reply that his decision to instruct counsel to forego the lesser-included-offense instruction amounted to a waiver of counsel which required a hearing under *Faretta v. California*, 422 U.S. 806, 835 (1975).  (Supp. Reply, Doc. 52 at 12.)

Distinct Claim - This *Faretta* claim is not the claim raised in the Amended Petition.   Rather, the claim raised in the Amended Petition was that counsel was defective for failing to insist on the instruction.  The former focuses on counsel's failure to mandate a formal hearing pursuant to *Faretta* prior to relying on Petitioner's "waiver" of his right to a lesser included offense instruction.   The latter focuses on counsel's performance in court in deciding to rely himself upon Petitioner's instructions. The former focuses on the Court's authority to rely upon Petitioner's direction.   The latter focuses on counsel's decision making process. They are distinct claims, and the former was not raised until Petitioner's Supplemental Reply.

Claim without Merit – Even if Petitioner's *Faretta*  claim were properly raised, it is plainly without merit.

In *Faretta*, the Supreme Court acknowledged that the Constitution only created a *right* to the *assistance* of counsel, but that the defendant could not be compelled to proceed with counsel.

> The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'

*Faretta v. California*, 422 U.S. 806, 834 (1975) (quoting *Illinois v. Allen*, 397 U.S. 337, 350-351 (Brennan, J., concurring)).  The Court also counseled that "in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id.* at 835.

Here, Petitioner did not waive representation.  He was represented and advised by counsel.  He simply chose, in one instance, to ignore counsel's advice and insist on a

course of conduct that may (or may not) have proved harmful. *Faretta* did not involve such a disagreement between counsel and the defendant over strategy, but a decision to dispense with counsel altogether. Petitioner proffers no authority for the extension of *Faretta* to such disagreements. The undersigned has found none.

Moreover, *Faretta* imposed no formulaic requirement for a knowing and intelligent waiver of counsel. At most, the Court directed that "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835. Petitioner points to cases involving a complete waiver of counsel at trial as establishing the requisites for establishing a sufficient record. (Supp. Reply, Doc. 52 at 12, quoting *U.S. v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999).) However, the Supreme Court has made clear that the advice required from the court is dependent upon the context in which counsel is being waived. In *Patterson v. Illinois*, 487 U.s 285 (1988), the Court observed that the dangers of self-representation at trial were broad, and consequently the advice required under *Faretta* was rigorous. "[A]t trial, counsel is required to help even the most gifted layman adhere to the rules of procedure and evidence, comprehend the subtleties of voir dire, examine and cross-examine witnesses effectively (including the accused), object to improper prosecution questions, and much more." *Id.* at 300, n. 13. In contrast, in *Patterson*, the waiver was of a right to counsel at post-indictment questioning, where counsel's role was "relatively limited." *Id.*

> In these extreme cases, and in others that fall between these two poles, we have defined the scope of the right to counsel by a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel. An accused's waiver of his right to counsel is "knowing" when he is made aware of these basic facts.

487 U.S. at 298. Thus, the Court concluded that the *Miranda* warnings issued at the questioning sufficed to permit a knowing waiver of counsel. "*Patterson* describes a pragmatic approach to the waiver question, one that asks what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could

provide to an accused at that stage, in order to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized." *Iowa v. Tovar*, 541 U.S. 77, 90 (2004).

Here, as discussed above, the trial court carefully reviewed with Petitioner the risks of ignoring his counsel's advice. Petitioner fails to suggest what additional *relevant* advice by the trial court was required to render his waiver of counsel's advice knowing and voluntary. Thus, assuming *Faretta* applies to such matters, Petitioner has failed to show it's requirements were not met.

**Ability to Rely Upon Client's Instructions** - Apart from the new arguments concerning the intelligent nature of his directions to counsel regarding the lesser included offense, Petitioner's claim is that counsel could not acquiesce in those directions.

The Ninth Circuit has recognized that taking an all-or-nothing approach on lesser-included-offense instructions may be a reasonable tactical decisions by counsel. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Ordinarily, that might resolve the issue, since the court need not determine the actual reason for an attorney's actions, as long as the act falls within the range of reasonable representation. *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96 (1992). On the other hand, while they need not discern the actual reason for counsel's conduct to deem it reasonable, "courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–527 (2003)). Here, this Court is not faced with a blank  record on trial counsel's reasoning. It appears from the available record that counsel believed Petitioner was making the wrong decision in refusing a lesser included offense instruction. He said as much to the trial court and in his post-trial interview.

Petitioner contends that because the decision was a tactical one, counsel was obligated to ignore Petitioner and proceed on the basis of his own evaluation. The

1  undersigned has found no controlling law and no persuasive law on point, dealing with a

2  lesser included offense instruction.

3        Thus, in evaluating such a claim, this Court is left with the common *Strickland*

4  standard of looking to what is expected of reasonably competent counsel under the

5  circumstances applicable at the time, without the benefit of hindsight. *Strickland*

6  recognized that the defendant was a relevant factor in deciding what was reasonable

7  competence. "The reasonableness of counsel's actions may be determined or

8  substantially influenced by the defendant's own statements or actions. Counsel's actions

9  are usually based, quite properly, on informed strategic choices made by the defendant

10  and on information supplied by the defendant." *Strickland*, 466 U.S. at 691.   That is not

11  to say that counsel is invariably bound by his client's instructions.   *See e.g. Jones v.*

12  *Barnes*, 463 U.S. 745 (1983) (appointed appellate counsel not obligated to present every

13  colorable claim suggested by client). But neither is he free to blindly disregard those

14  instructions.

15        Though not controlling, s*ee Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010), the

16  American Bar Association's Criminal Justice Section Standards are instructive:

17        (a) Certain decisions relating to the conduct of the case are
18  ultimately for the accused and others are ultimately for defense
     counsel. The decisions which are to be made by the accused after
     full consultation with counsel include:
19           (i) what pleas to enter;
         (ii) whether to accept a plea agreement;
20           (iii) whether to waive jury trial;
         (iv) whether to testify in his or her own behalf; and
21           (v) whether to appeal.
      (b) Strategic and tactical decisions should be made by
22  defense counsel after consultation with the client where feasible and
     appropriate. Such decisions include what witnesses to call, whether
23  and how to conduct cross-examination, what jurors to accept or
     strike, what trial motions should be made, and what evidence should
24  be introduced.
      (c) If a disagreement on significant matters of tactics or
25  strategy arises between defense counsel and the client, defense
     counsel should make a record of the circumstances, counsel's advice
26  and reasons, and the conclusion reached. The record should be made
     in a manner which protects the confidentiality of the lawyer-client
27  relationship.

28  ABA  Crim.  Just.  Sect.  Stand.,  Standard  4-5.2  Control  and  Direction  of  the  Case,

available at http://www.americanbar.org/publications/criminal_justice_section_archive/ crimjust_standards_dfunc_blk.html, last accessed 5/7/15. *See also Strickland,* 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ('The Defense Function'), are guides to determining what is reasonable, but they are only guides.").

The Arizona Rules of Professional Conduct similarly direct that "a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by ER 1.4, shall consult with the client as to the means by which they are to be pursued." Ariz. Rev. Stat., Sup. Ct. R. 42, R. Prof. Conduct, ER 1.2(a).  The Rule further directs that "[i]n a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." *Id.*  The Comments to the 2003 Amendments addresses disputes over the means of pursuing objectives:  "Because of the varied nature of the matters about which a lawyer and client might disagree and because the actions in question may implicate the interests of a tribunal or other persons, this Rule does not prescribe how such disagreements are to be resolved."  *Id.* at Comment 2 to 2003 Amendments.

Arizona ER 1.4 directs that a lawyer must "reasonably consult with the client about the means by which the client's objectives are to be accomplished."  Ariz. Rev. Stat., Sup. Ct. R. 42, R. Prof. Conduct, ER 1.4(a)(2).  The Comments to the 2003 Amendments to ER 1.4 observe: "In some situations--depending on both the importance of the action under consideration and the feasibility of consulting with the client--this duty will require consultation prior to taking action. In other circumstances, such as during a trial when an immediate decision must be made, the exigency of the situation may require the lawyer to act without prior consultation."  *Id.* at Comment 2 to 2003 Amendments.  The Comments further note that "lawyers usually defer to the client regarding such questions as the expense to be incurred and concern for third persons who

might be adversely affected."

Both the ABA Standards and the Arizona Rules of Professional Conduct acknowledge that the client's involvement in directing litigation ranges from *controlling* to *participative* to *unnecessary*. It is instructive to note that the itemizations in the ABA standard are not exhaustive, but illustrative. Both the ABA Standards and the Arizona Rules reflect the reality that what in one case may be a routine tactical decision which counsel should make, may in another case be a fundamental decision about the nature and course of the representation such that the decision should be left to the defendant.

On the ***controlling*** end, some decisions are so central to the progress of the defense, the wishes of the defendant are absolutely final. In these areas, counsel serves a purely advisory capacity. He has no authority but to accept the determination of his client (though at times subject to his ethical obligations as an officer of the court). At times these matters are described as the objectives of the representation. But the scope is wider. "Other fundamental decisions, such as whether to forego assistance of counsel, to waive a jury trial, or to testify in one's own behalf, in a sense may be viewed as strategic decisions because they relate to the means employed by the defense to obtain the primary object of the representation—ordinarily, a favorable end result. Nevertheless, these decisions are so personal and crucial to the accused's fate that they take on an importance equivalent to that of deciding the objectives of the representation." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1435 (3d Cir. 1996). Thus, counsel may be obligated to concede to his client's directions "where respect for the individual's autonomy requires us to disregard the desirability of having professional judgment exercised in the client's best interest." *Id.* at 1435. *See* Hashimoto, *Resurrecting Autonomy: The Criminal Defendant's Right to Control the Case*, 90 B.U.L. Rev. 1147, 1161 (2010).

Moreover, the enumeration of situations in which a client's decision is controlling is apparently not exhaustive. For example, in *Florida v. Nixon*, 534 U.S. 175 (2004), a capital murder case, defense counsel decided "to concede guilt and to home in, instead,

on the life or death penalty issue." *Id.* at 189. Counsel had consulted with the defendant on the strategy, who was unresponsive. The Court observed that "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." 543 U.S. at 187. "Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action." *Id.* Nonetheless, the Court then considered whether a concession of guilty was the "functional equivalent" of a guilty plea, such that affirmative consent was required, and concluded it was not because the prosecution was nonetheless required to prove its case despite counsel's concession. Thus, *Nixon* illustrates that other trial decisions, which are functional equivalents of enumerated ones, are subject to control by the client. *See* James Michael Blakemore, *Counsel's Control over the Presentation of Mitigating Evidence During Capital Sentencing*, 111 Mich. L. Rev. 1337, 1349 (2013) ("The Court has yet to articulate a clear legal standard for determining whether a decision is strategic or fundamental.").

At the ***unnecessary*** end of the spectrum, some decisions are so ministerial or technical in nature, or the exigencies of trial require such immediate decisions, that counsel need not even consult with his client before making the decision. In addressing the authority of counsel to consent to a magistrate judge presiding over jury selection, the Supreme Court observed:

> Giving the attorney control of trial management matters is a practical necessity. "The adversary process could not function effectively if every tactical decision required client approval." The presentation of a criminal defense can be a mystifying process even for well-informed laypersons. This is one of the reasons for the right to counsel. Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial. These matters can be difficult to explain to a layperson; and to require in all instances that they be approved by the client could risk compromising the efficiencies and fairness that the trial process is designed to promote. In exercising professional judgment, moreover, the attorney draws upon the expertise and experience that members of the bar should bring to the trial process. In most instances the attorney will have a better understanding of the

procedural choices than the client; or at least the law should so assume.

*Gonzalez v. United States*, 553 U.S. 242, 249-50 (2008) (citations omitted).   *See also Jones v. Barne*s, 463 U.S. 745, 760 (1983) (Brennan, J. dissenting) (recognizing that decisions at trial "must often be made in a matter of hours, if not minutes or seconds. From the standpoint of effective administration of justice, the need to confer decisive authority on the attorney is paramount with regard to the hundreds of decisions that must be made quickly in the course of a trial."); and *Wainwright v. Sykes*, 433 U.S. 72, 93 (1977) (Burger, C.J., concurring) ("Once counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate and ultimate responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop. Not only do these decisions rest with the attorney, but such decisions must, as a practical matter, be made without consulting the client.").

These types of issues are harder to define (and perhaps thus not illustrated in the ABA standard) because what is purely ministerial in one trial may be a significant turning point in another trial.

In the ***participatory*** middle, the client's wishes may or may not be absolutely controlling, but they are at a minimum relevant to a determination of the adequacy of counsel's performance.   In such situations, the ABA standard instructs that counsel should confer with the client, but ultimately counsel must make the decision.   Even there, however, there is no hard and fast rule about what deference counsel can or must give to his client's wishes.   The requirement that counsel decide is not a direction for counsel to simply supplant his decision for his client's, but a recognition that counsel ultimately has the practical responsibility for the progress of the defense.   He need not dictate every turn, but his hand must remain on the wheel lest the defense crash from indecisiveness.

Thus, the ABA standard dictates no solution to disagreements, but merely directs that "counsel should make a record of the circumstances, counsel's advice and reasons, and the conclusion reached."   The Arizona Rule similarly declines to direct a resolution.

*See* Ariz. Rev. Stat., Supreme Ct. R. 42, R. Prof. Conduct 1.2, Comments to 2003 Amendments ¶ 2 ("Because of the varied nature of the matters about which a lawyer and client might disagree and because the actions in question may implicate the interests of a tribunal or other persons, this Rule does not prescribe how such disagreements are to be resolved.")

In contrast, the Restatement (Third) of the Law Governing Lawyers takes a more pointed approach, and concludes that a "client may instruct a lawyer during the representation." Restatement (Third) of Law Governing Law § 21(2) (2000). "A client may give instructions to a lawyer during the representation about matters within the lawyer's reasonable power to perform, just as any other principal may instruct an agent." *Id.* at Comment (d).

In evaluating cases addressing counsel's acquiescence in the defendant's directions, at first blush the cases appear to be at odds. For example, the Fifth Circuit has regularly held that counsel has the freedom to forego his own professional judgment in favor of following his client's instructions. "Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence. In fact, this court has held on several occasions that a defendant cannot instruct his counsel not to present evidence at trial and then later claim that his lawyer performed deficiently by following those instructions." *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007). In contrast, the First Circuit has observed that "in some instances, listening to the client rather than to the dictates of professional judgment may itself constitute incompetence."[23] *United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993).

The difference might be explained if the courts are presumed to have made an implicit determination about whether the issue involved was a "controlling" or a

---

[23] In *McGill*, the defendant was imitating the Russian roulette scene from the movie *The Deerhunter* when the weapon discharged, killing the victim. The prosecution planned to show the scene. Over defendant's objection, and based on a judgment that the clip was admissible, counsel stipulated to the entire movie being played, purportedly to diffuse the impact of the scene.

"participatory" one. For example, *Wood* and the cases on which it primarily relied, *Autry v. McKaskle*, 727 F.2d 358 (5th Cir.1984), *Nixon v. Epps*, 405 F.3d 318 (5th Cir. 2005), *Roberts v. Dretke*, 356 F.3d 632 (5th Cir. 2004), and *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) all involved capital murder defendants who had instructed their attorneys to not present any defense in the sentencing phase.  The decision to not oppose a death penalty is far more akin to entry of a plea, and arguably takes *Wood*, *Autry*, *Nixon*, *Roberts,* and *Dowthitt* out of the "participatory" types of decisions, and places it in the "controlling" type.

In other cases seemingly in the *participatory* realm, counsel seems to have been found competent when following his client's direction, despite his professional judgment, where counsel's choices were effectively limited by his client, e.g. by the client's refusal to assist in pursuing the lawyer's preferred stratagem, or the client's state intent to work to disrupt the strategy.[24]  For example, in *Alvord v. Wainwright*, 725 F.2d 1282, 1289 (11th Cir. 1984), counsel acquiesced in his client's insistence on not asserting an insanity defense. The Eleventh Circuit noted that "the defendant…did not want and affirmatively sought to prevent his trial attorney from asserting the insanity defense," and counsel "did not think [the defense] would be successful without [defendant's] cooperation."  725 F.2d at 1288.

Similarly, in *Schriro v. Landrigan*, 550 U.S. 465 (2007), the Court considered counsel's failure to present mitigating evidence at a capital sentencing hearing.[25]  The defendant had not only instructed counsel to not present the evidence, but interrupted the presentation of the mitigating evidence and had apparently convinced the witnesses to refuse to testify in his behalf.  The Court distinguished precedent on the basis that the cases did not address "a situation in which a client interferes with counsel's efforts to

---

[24] Similarly, in *Wood*, the defendant had proposed firing his lawyers and proceeding unrepresented, rather than having them present a defense.  See *Wood*, 491 F.3d at 203

[25] Petitioner argues this Court should disregard *Schriro*  and other cases involving capital cases.  (Supp. Reply, Doc. 52 at 11.)  However, despite the factual differences, the principle in *Schriro*, that a defendant's conduct could preclude an allegation of ineffective assistance, remains persuasive.

present mitigating evidence." *Id.* at 478. Applying AEDPA deference to the state court decision, the Court concluded: "In short, at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence." *Id.* at 478.

On the other hand, active interference has not always been required. For example, in *Foster v. Strickland*, 707 F.2d 1339, 1343 (11th Cir. 1983), the defendant declined to assert an insanity or second degree murder defense, and counsel acquiesced despite his belief that it was the most viable defense.[26] The Eleventh Circuit relied upon the American Bar Association Code of Professional Responsibility to conclude that counsel "had an ethical obligation to comply with his client's wishes and was thus unable to present an insanity defense." *Foster*, 707 F.2d at 1343. The Court opined: "Petitioner, who preempted his attorney's strategy choice, cannot now claim as erroneous the very defense he demanded [counsel] present." *Id.* at 1343-44.

Turning to the specific decision at hand in this case, there seems to be confusion within the legal profession on whether the decision to choose an all-or-nothing defense by waiving a lesser included offense instruction is a *participatory* or a *controlling* type of decision. The ABA appears to have taken both approaches. The Comments to the 1993 version of the ABA Criminal Justice Standards instructs: "It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury." ABA Crim. Just. Sect.

---

[26] Conversely, counsel may be deemed effective despite his failure to follow a client's demands on a "participatory" type of decision. Thus in *Routly v. Singletary*, 33 F.3d 1279 (11th Cir.1994), counsel was deemed effective even for legitimate tactical reasons he refused to make a motion for mistrial when the jury reported during deliberations that they had been unable to hear portions of the testimony. In *United States v. McGill*, 11 F.3d 223 (1st Cir.1993), counsel was found competent even though he insisted over defendant's objection on playing an entire movie to the jury, not just the few minutes of the scene the murder defendant was accused of imitating. However, even if Petitioner's counsel would have been effective had he insisted on the lesser-included-offense instruction, that does not mean he was ineffective in not doing so. Such choices are not mutually exclusive, hence the deference given to counsel in making such choices.

Stand., Standard 4-5.2 Control and Direction of the Case, Commentary (1993 ed.).  This seems to suggest the decision is *participatory*.  On the other hand, the Commentary to the 1980 edition cast the question in the *controlling* category.

> It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury. Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter.

Standards for Criminal Justice, Vol. 1, Standard 4-5.2 commentary at 68 (2d ed. 1986 Supp.)).  *See also* Uphoff & Wood, *The Allocation of Decisionmaking Between Defense Counsel and Criminal Defendant: An Empirical Study of Attorney-Client Decisionmaking*, 47 U. Kan. L. Rev. 1, 60 (1998) (quoting Standards for Criminal Justice Standard 4-5.2 commentary at 68 (2d ed. 1980)).

Petitioner paints the selection of a lesser included offense instruction as a purely tactical matter, over which counsel should hold the final determination. (Supp. Reply, Doc. 52 at 9-10.)  While that might ordinarily be true for jury instructions, the request for a lesser included offense instruction is not merely a matter of applying legal requirements to the facts of case.  Instead, such an instruction involves a fundamental evaluation of the strength of the defense's case, and the defendant's determination of his risk aversion in light of the circumstances.  Such decisions are not the type of purely legal, technical decision like the phrasing of a reasonable doubt instruction, about which counsel might not even be expected to consult with the defendant.  Thus, it appears they are not in the *unnecessary* category.

Arguably, neither are they the type of strategic decisions like what witnesses to call or what theory of the case to present, about which counsel may ultimately have to make the decisions, but on which he should confer with the defendant.  Thus, they may not even be in the *participatory* category.  Rather, a request for lesser included offense

instructions is arguably much closer to deciding whether to accept a plea agreement or to testify, and thus in the *controlling* category. *See also* Johnson, *The Law's Hard Choice: Self-Inflicted Injustice or Lawyer-Inflicted Indignity*, 93 Ky. L.J. 39, 103 (2005) ("the decision to argue for a lesser offense shares qualities with the decision about whether to accept a plea bargain involving a plea of guilty to a lesser offense").

Even if deemed to be in the *participatory* category, Petitioner's contention that counsel was bound to allow his own judgment to override Petitioner's demands is, at the best, unclear. *See e.g.* LaFave, *et al*, *Counsel's Control Over Defense Strategy*, Crim. Proc. § 11.6(a) (3d ed.) ("Of course, where the law is unclear, or even where it is clear and places ultimate authority with counsel, a defense lawyer can always follow his or her client's wishes, provided that path does not require the lawyer to violate standards of professional responsibility."); Uviller, *Calling the Shots: The Allocation of Choice Between the Accused and Counsel in the Defense of a Criminal Case*, 52 Rutgers L. Rev. 719, 748 (2000) ("Part gamble, part experience, it is difficult to say whether this vital choice belongs among the defendant's reserved prerogatives or has been ceded to the wisdom and caution of counsel.").

It is true that in the context of deciding whether to call a given witness, the Arizona Supreme Court has concluded that counsel may not concede his better judgment. *See State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984). But even there, the Arizona court conceded that "the question [was] one of first impression." *Id. at* 215, 689 P.2d at 158. Moreover, *Lee* did not present a clean picture of a simple strategic choice because the witnesses demanded by the defendant were expected to present perjured testimony, implicating counsel's overriding ethical obligations. *Id.* at 215-216, 689 P.3d at 158-159. Moreover, reading *Lee* as requiring counsel to reject his client's instructions on strategic matters flies in the face of the determinations by both the Supreme Court and the Arizona courts it upheld in *Schriro v. Landrigan*, 550 U.S. 465 (2007), finding that counsel was not ineffective for failing to present mitigating evidence over his clients' instructions. *See also Williams v. Woodford,* 384 F.3d 567, 622 (9th Cir. 2004) ("having

reasonably investigated mitigating evidence and prepared for the penalty phase, counsel is not deficient for failing to introduce evidence in mitigation when the defendant makes an informed and knowing decision not to present the evidence").   *Cf. id.* at 623 (where defendant's request that no witnesses testify also coincided with counsel's reasonable professional judgment,  counsel's deference to defendant's request "is beyond criticism").

At the worst, Petitioner is simply wrong about counsel's ability to override his client's directions to pursue an the all-or-nothing defense.  *See*  Pflaum, *Justice Is Not All or Nothing: Preserving the Integrity of Criminal Trials Through the Statutory Abolition of the All-or-Nothing Doctrine*, 73 U. Colo. L. Rev. 289, 302 (2002) ("The decision is the client's to make. The defense attorney must apprise his client of the risks and potential rewards so that the defendant can contribute to his own defense and decide if he wants to employ the All-or-Nothing Doctrine.").

At the end, however, this Court need not finally resolve the issue, because the one clear thing is that the law is not clear.  *See* Uphoff, *Who Should Control the Decision to Call A Witness: Respecting A Criminal Defendant's Tactical Choices*, 68 U. Cin. L. Rev. 763, 775 (2000) ("Simply put, the vague and conflicting provisions of the Model Code do not provide lawyers a useful framework for determining how decisionmaking responsibility is to be divided properly between lawyer and client."); *id.* at 789 ("In the final analysis, neither the Constitution nor the Supreme Court offers a definitive answer to the question …Decisions of the Supreme Court certainly do not preclude a lawyer from sharing decisionmaking power with a client-or deferring to a client's informed tactical choice-and, at times, even encourage such a relationship."); and Johnson, *The Law's Hard Choice: Self-Inflicted Injustice or Lawyer-Inflicted Indignity*, 93 Ky. L.J. 39, 104 (2005) ("The complexities of allocating the lesser-offense decisions have produced unreconciled opinions in some jurisdictions.").

Faced with a lack of clearly controlling authority on counsel's ability to follow his client's instructions, armed with knowledge that "[c]ounsel's actions are usually based,

quite properly, on informed strategic choices made by the defendant," *Strickland*, 466 U.S. at 691, the undersigned must conclude that counsel's decision to acquiesce in Petitioner's demand to forego the lesser-included-offense instruction was "within the wide range of reasonable professional assistance," *id.* at 689, even if Petitioner's instructions were against counsel's advice.

Petitioner protests that the all-of-nothing defense undermined counsel's trial strategy of challenging the use of the knife and/or the existence of the requisite threat, and preparing for a lesser-included-offense.  (Supp. Reply, Doc. 52 at 5.)  Because the undersigned concludes that counsel could properly acquiesce to Petitioner's instructions, the undersigned need not evaluate whether those instructions were antithetical to the over-all strategy at trial.

Nonetheless, the undersigned does not find the strategies antithetical.  Had counsel succeeded in convincing the jury there was no knife or no threat, the all-or-nothing defense would have resulted in no conviction.  Counsel may have not been as optimistic as Petitioner on the success of disproving the prosecution's case (and thus more desirous of leaving the jury other options), but the strategy was consistent with rejecting a lesser-included-offense instruction.

Petitioner argues that trial counsel has now admitted that his choice may have been a mistake.  (Reply, Doc. 35 at 64.)   But trial counsel's current view is no more informative in suggesting an error than it would be if insisting his decision were correct.  Both conclusory assertions employ the "the distorting effects of hindsight."  *Strickland*, 466 U.S. at 669.  "However, admissions of inadequate performance by trial lawyers are not decisive in ineffective assistance claims. Ineffectiveness is a question for the courts, not counsel, to decide."  *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998).  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

In sum, the undersigned finds it perfectly clear that counsel's decision to yield to Petitioner's instruction was "within the wide range of reasonable professional

1   assistance." *Strickland*, 466 U.S. at 689.

2   **Prejudice** – Respondents argue that any challenge to counsel's conduct with

3   regard to the lesser included offense cannot meet the prejudice standard because the jury

4   convicted on the greater offense, and any argument that they might have convicted on

5   the lesser offense would imply that the jury would have taken an opportunity to ignore

6   the law and evidence and acquit on the greater offense.

7   In reply, Petitioner simply argues that this is a misapplication of the jury

8   nullification principles, and cites *Keeble v. United States*, 412 U.S. 205, 212-13 (1973)

9   for the proposition that "[w]here one of  the elements of the offense charged remains in

10  doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its

11  doubts in favor of conviction."

12  Petitioner's reliance on *Keeble* is misplaced.  *Keeble* did not involve ineffective

13  assistance of counsel, but a refusal by the trial court to give a lesser included offense

14  instruction.  In that context, the standard is "whether the error had a substantial and

15  injurious effect on the jury's deliberations and verdict."  *Ghent v. Woodford*, 279 F.3d

16  1121, 1134 (9th Cir. 2002), as amended (Mar. 11, 2002).  In contrast, in the context of a

17  claim of ineffective assistance of counsel, the Petitioner must show "a reasonable

18  probability that, but for counsel's unprofessional errors, the result of the proceeding

19  would have been different." *Strickland*, 466 U.S. at 694.  The standard under *Strickland*

20  is higher than the harm sufficient for reversal under the "substantial and injurious effect"

21  standard applicable to instructional errors.  *See Kyles v. Whitley*, 514 U.S. 419, 435-436

22  (1995).  *See also Cooper v. Calderon*, 255 F.3d 1104, 1118 (9th Cir. 2001) (Browning,

23  C.J. dissenting).

24  Thus, to prevail, Petitioner must convince this Court that there is a reasonable

25  probability that had the lesser included offense instruction been given, the jury would not

26  have convicted on the aggravated assault, but would have convicted on the lesser

27  included offense.  This, in turn, would require this Court to make one of two assumptions

28  about the jury in this case: either the jury ignored the law and/or evidence in convicting

73

1    on the aggravated assault, or that they correctly convicted but would not have done so if

2    given another alternative.  These assumptions would require this Court to conclude that

3    the jury either did act lawlessly, or that they would have been willing to do so.

4           Neither assumption is permissible under *Strickland*.

5                  In making the determination whether the specified errors
                   resulted in the required prejudice, a court should presume, absent
6                  challenge to the judgment on grounds of evidentiary insufficiency,
                   that the judge or jury acted according to law.  An assessment of the
7                  likelihood of a result more favorable to the defendant must exclude
                   the possibility of arbitrariness, whimsy, caprice, "nullification," and
8                  the like. A defendant has no entitlement to the luck of a lawless
                   decisionmaker, even if a lawless decision cannot be reviewed. The
9                  assessment of prejudice should proceed on the assumption that the
                   decisionmaker is reasonably, conscientiously, and impartially
10                 applying the standards that govern the decision.

11   *Strickland*, 466 U.S. at 694-95.

12          Petitioner attempts to dismiss this as a misapplication of principles of jury

13   nullification.  Petitioner makes no explanation of how the concepts are in tension.  Jury

14   nullification cases address the fact that juries sometimes refuse to convict despite

15   adequate law and evidence to do so.  "Jury nullification is a reality, but it is not a right

16   under the Constitution, laws or treaties of the United States."  *Hernandez v. Hamlet*,

17   2003 WL 21729867, at *10 (N.D. Cal. June 7, 2003).  While preventing a jury from

18   "bring[ing] in a verdict in the teeth of both law and facts" might amount to improperly

19   giving the judge the power "to direct a verdict," *see* Horning v. D.C., 254 U.S. 135, 138

20   (1920), that does not mean that the courts must countenance such conduct with a

21   presumption that juries will engage in it.

22          Respondents argue that it would be speculation to conclude that the jury convicted

23   Petitioner on the aggravated assault because there was no alternative for a lesser included

24   offense.  (Amend. Supp. Ans., Doc. 46 at 38-39.)  This Court need not speculate.

25   Rather, *Strickland* mandates a presumption that the jury acted in accordance with the law

26   when they convicted Petitioner.  That means that to find prejudice, this Court must now

27   assume that the jury (if given the opportunity to do so) would have refused to convict in

28   violation of their sworn obligation and the instructions of the court.  *Strickland* precludes

reliance upon such possibilities of lawless decision making to establish prejudice.

The only exception permitted by *Strickland* to the presumption is cases challenging a judgment "on grounds of evidentiary insufficiency."  Petitioner makes no assertion that the evidence at trial was insufficient to convict him of aggravated assault. "Mr. Navarro is not requesting that the court assess the sufficiency of the evidence against him."  (Supp. Reply, Doc. 52 at 3.)  And certainly that is not the aim of the instant claim.  Accordingly, the presumption applies, and this Court must presume for purposes of *Strickland* that had the additional instructions been given, the jury would still have convicted of aggravated assault.

**7.  Assertion of Cumulative Error**

In his Supplemental Reply, Petitioner argues in searching for prejudice from counsel's performance, that this Court must evaluate the cumulative effect of any deficiencies.  (Supp Reply Doc. 52 at 2.)  Indeed, in analyzing prejudice, the Ninth Circuit "has recognized the importance of considering the cumulative effect of multiple errors and not simply conducting a balkanized, issue-by-issue harmless error review." *Ayala v. Wong*, 756 F.3d 656, 672 (9th Cir.) *cert. granted sub nom.* Chappell v. Ayala, 135 S. Ct. 401 (2014) (quoting *Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir.2005)).

Here, however, the undersigned has disposed of all but one claim (that relating to the lesser-included-offense instruction) without resorting to any analysis of prejudice. With regard to that exception, the undersigned has determined an absence of deficient performance and an absence of prejudice.  Nonetheless, there being no other examples of deficient performance to consider with any perceived deficiency on the lesser-included-offense instruction, there is no cumulative effect to be considered.

/ /

/ /

/ /

**D.  SUMMARY**

Petitioner's Petition is timely, but his claims are procedurally defaulted.  Because the claims of ineffective assistance of trial counsel are plainly without merit, however, they may and should be denied on their merits, without resorting to an analysis (based upon an expanded record) of any ineffectiveness of PCR counsel.

## IV.  CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in

its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on the merits. Under the reasoning set forth herein, the constitutional claims are plainly without merit.

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.

## V.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Amended Petition for Writ of Habeas Corpus, filed November 21, 2012 (Doc.  7) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings and recommendations are adopted in the District Court's order, a Certificate of Appealability be **DENIED**.

## VI. EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section 2254 Proceedings.   Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-

1  47 (9th Cir. 2007).

2

3  Dated: May 20, 2015

   12-1899-058r RR 15 05 07 re HC.docx

4

James F. Metcalf
United States Magistrate Judge